# REPORTS OF CASES

### ADJUDGED IN

# THE COURT OF APPEALS

#### OF THE

## DISTRICT OF COLUMBIA.

## CRAWFORD *v.* UNITED STATES.

CRIMINAL LAW; CONSPIRACY TO DEFRAUD THE UNITED STATES; SEC. 5440, U. S. REV. STAT., U. S. COMP. STAT. 1901, p. 3676; PUBLIC OFFICERS; JURORS, QUALIFICATION OF; CHALLENGES; TRIAL; JUDICIAL DISCRETION; EVIDENCE; CRIMINAL INTENT; PREJUDICIAL ERROR; CONDUCT AS EVIDENCE; ENTRIES AS EVIDENCE; OVERT ACTS; IMPEACHING AND CONTRADICTING WITNESSES; CROSS-EXAMINATION; SELF-SERVING DECLARATIONS; ORDER OF PROOF; MISCONDUCT OF COUNSEL.

1. Any agreement the object of which is to deprive the Federal government of the services of those who are intrusted with the discharge of duties which are essential to its proper administration is a conspiracy to defraud the United States, within the meaning of sec. 5440, U. S. Rev. Stat. U. S. Comp. Stat. 1901, p. 3676, punishing any person who shall conspire to commit any offense against or to defraud the United States, if any one or more of such parties shall do any act to effect the object of the conspiracy. (Following *Palmer* v. *Colladay*, 18 App. D. C. 426, and *Tyner* v. *United States*, 23 App. D. C. 362.)

2. The certainty required in the definition of an offense may be accomplished by the use of words or terms of settled meaning, or which indicate offenses well known to and defined by the common law; and this has been accomplished in sec. 5440, U. S. Rev. Stat., by the use of the terms "conspiracy" and "defraud." (Distinguishing *Czarra* v. *Medical Supervisors*, 25 App. D. C. 443.)

VOL. XXX.—1.

**2**          CRAWFORD *v.* UNITED STATES.

3. Sec. 215, D. C. Code (31 Stat. at L. 1223, chap. 854) determining who are qualified to act as jurors in this District, does not disqualify salaried officers of the government; and such officers are not disqualified, but are merely given the right to assert their exemption from jury duty, by sec. 217 (31 Stat. at L. 1224, chap. 854) which provides that such officers of the government, among other persons named, "shall be exempt from jury duty, and their names shall not be placed on the jury list."

4. *It would seem* that where a juryman was challenged because he was "a salaried officer of the United States," and not specifically on account of any bias he might entertain by reason of his employment, an assignment of error based upon the overruling of the challenge cannot be sustained, in view of sec. 919, D. C. Code (31 Stat. at L. 1338, chap. 854), providing that "no verdict shall be set aside for any cause which might be alleged as ground for challenge of a juror before the jury are sworn, except when the objection to the juror is that he had a bias against the defendant such as would have disqualified him, and such disqualification was not known to or suspected by the defendant or his counsel before the juror was sworn." (Chief Justice Shepard dissenting.)

5. A druggist whose store is a postal substation of the Washington city postoffice, and who receives from the United States a compensation of $300 a year as clerk in charge of such substation, out of which he pays clerk hire and rent, and who is otherwise qualified to act as a juryman, is not, by reason of his employment, *ipso facto* disqualified to act as a juryman in a criminal prosecution by the United States, in which the accused is charged with conspiracy to defraud the United States in connection with the purchase of postal supplies. (Chief Justice Shepard dissenting.)

6. Where a letter written by a witness for the prosecution in a criminal case to the accused, and charging the accused with having abstracted certain correspondence, and having made an erasure in the index of a letter-press book of certain companies, of which the witness was president, is erroneously admitted in evidence without objection by the accused, a subsequent motion to strike it out is addressed to the discretion of the trial court; and any error committed in the exclusion of the reply of the accused to such letter, explaining his action, is cured where defendant thereafter, when on the stand, offers the same explanation.

7. In a criminal case where the intent of the accused in doing a given act is material, it is permissible for him to testify as to his intent or motive.

8. It is error, but not prejudicial error, for the trial court, in a criminal

case in which the accused is charged with conspiracy to defraud the United States, to refuse to allow the accused to testify as to his intent or motive in taking letters from the files of a company and making an erasure in its letter-press book, after the prosecution has offered evidence showing he had done so, but not showing his intent in so doing, and after the accused has produced the letters so taken, which contain no incriminating statements; and has denied that he acted surreptitiously, explained the erasure, and stated that the president of the company told him he could have what he wanted from the company's files, and that his object was to show everything in connection with the charge of conspiracy pending against him.    (Chief Justice Shepard dissenting.)

9. It is not error for the trial court in a criminal case to refuse to admit evidence offered on behalf of the accused as to his conduct after he had reason to believe he was suspected of the offense charged, tending to show a consciousness of innocence on his part, although the prosecution has offered evidence tending to show by his conduct a consciousness on his part of guilt.

10. In a criminal case, entries in a private account book of the accused, showing moneys drawn on account of a certain company, and kept for the purpose of submitting to the president of the company, and submitted to him, are not admissible in evidence when offered by the accused as corroborative of his testimony that he had informed the president of the company verbally of the moneys so drawn.    (Following *Gurley* v. *MacLennan*, 17 App. D. C. 170.)

11. In the trial of an indictment under sec. 5440, U. S. Rev. Stat., where the conspiracy to defraud the United States consists of an alleged unlawful agreement between the accused and two others, one of whom was a government official, to divide among themselves the proceeds of a valid contract to furnish supplies to the government, evidence by the accused tending to show the bona fides of the contract, or his good faith so far as the quality of the supplies were concerned, is irrelevant and inadmissible.

12. In cases of conspiracy the overt act of each conspirator, when done in pursuance of the conspiracy, or in reference to the common object, becomes the act of all, and is original evidence against all.

13. In a conspiracy case, where, after the trial court had refused to allow the accused to testify what he thought when he entered into the alleged unlawful agreement with one of his fellow conspirators, the accused was allowed to testify as to his conversations with the latter, and to the facts which induced him to enter into the agreement, and even his motives for so doing, there is no merit in an assignment of error by the accused based upon the refusal of the trial court to allow him to testify to what he thought.

14. *It would seem* that in interrogating a witness for the defense in a criminal case, for the purpose of showing that a witness for the prosecution made a statement out of court inconsistent with his testimony given in court, it is largely within the discretion of the trial court whether the impeaching witness shall be required to give the exact words used by the other witness out of court, or merely the substance of the statement then made by him.

15. If a witness is cross-examined concerning a fact purely collateral and irrelevant to the issue, and answers without objection, he cannot be contradicted; and the test of whether the fact so inquired of is collateral is, Would the cross-examining party be entitled to prove it as part of his case? If he would not, it is collateral; if he would, it is not collateral.

16. Where a fact sought to be proved by a witness for the defense in a criminal prosecution was excluded by the trial court, and it is claimed on appeal that such fact tended to show bias and prejudice on the part of a witness for the prosecution towards the accused, but it appears to the court that, on the contrary, it had an opposite tendency, the action of the trial court will not be held to be erroneous.

17. Self-serving declarations by one of the parties to a cause are not admissible in evidence.

18. It is within the sound legal discretion of the trial court in a criminal prosecution to allow the prosecution to introduce evidence, at the close of the defendant's case, which might have been more properly introduced as part of the case in chief; which discretion, in the absence of gross abuse, will not be reviewed on appeal.

19. The trial court in a criminal case properly refuses to allow counsel for the accused to argue to the jury concerning the failure of the prosecution to ask one of its witnesses regarding a certain fact, if the prosecution would not, over objection, have been allowed to prove that fact.

20. It is not error for the trial court in a criminal case to overrule a motion by the accused that the jury be told to disregard a remark made by counsel for the prosecution during the argument to the jury of counsel for the accused, when such remark was not directed to the jury, but was made in reply to a question asked by opposing counsel, —especially where the impropriety of such remark is not manifest.

21. An improper remark to the jury by the prosecuting attorney in a conspiracy case, such as that one of the alleged conspirators, not on trial, had pleaded guilty, is not ground for setting the verdict aside on appeal, where the trial court held that the remark was improper, counsel withdrew it, and the jury were told to disregard it.

D. C.]                    Statement of the Case.

(Following *Brady* v. *United States,* 1 App. D. C. 246; *Price* v. *United States,* 14 App. D. C. 399; *Yeager* v. *United States,* 16 App. D. C. 362; *Lorenz* v. *United States,* 24 App. D. C. 337; and *Fields* v. *United States,* 27 App. D. C. 433; and distinguishing *Capital Constr. Co.* v. *Holtzman,* 27 App. D. C. 125.)

22. Where three persons, C., L., and M., are charged with a conspiracy to defraud the United States, C. and L. by paying to M., and M., a government official, by receiving from them, part of the proceeds of a contract to furnish postal supplies to the government, on the trial of C. a special instruction to the jury, asked by him, is properly refused, when to the effect that payments by L. to M. are not to be considered for any purpose, unless the jury are satisfied beyond a reasonable doubt that, before such payments were made, C. had agreed with M. and L., or with one of them, that the payments should be made by L. out of moneys received by him; and a special instruction, asked by the accused, limiting the evidential force of a payment by L. to the accused, is also properly refused. As an overt act, the fact of such payments is admissible against all parties.

No. 1687.    Submitted December 14, 1906.    Decided May 10, 1907.

HEARING on an appeal by the defendant from a judgment of conviction of the Supreme Court of the District of Columbia in the trial of an indictment for an alleged conspiracy to defraud the United States.                    *Affirmed.*

The COURT in the opinion stated the facts as follows:

The appellant, William G. Crawford, was convicted in the supreme court of the District of Columbia on the first count of indictment numbered 24,688, charging him, August W. Machen, and George E. Lorenz with a conspiracy to defraud the United States; said indictment having been framed under sec. 5440, U. S. Rev. Stat., U. S. Comp. Stat. 1901, p. 3676. A motion for a new trial having been overruled, appellant was sentenced to the penitentiary for a term of two years. From this he has regularly prosecuted his appeal. The aforesaid first count of the indictment under which appellant was convicted charges, in substance, that on or before the 1st day of April, 1902, and there-

after, there were in use in the postal service of the United States certain satchels used by letter carriers, which were purchased from time to time by the United States through proper officers of the Postoffice Department; that the purchase of such supplies was assigned to the office of the First Assistant Postmaster General; and that in the subdivision of the business of that office there was a division of free delivery, at the head of which was August W. Machen; that it was the duty of Machen, under the First Assistant Postmaster General, to prepare specifications giving a description of such supplies as were desired to be purchased by said Department, for the purpose of receiving bids and proposals for the furnishing of the same. The indictment proceeds to set out in detail the duty and custom of Machen, as the general superintendent of said free delivery system, in reference to the purchase of such supplies from those who made bids to supply the same. It states that at the times aforesaid one William G. Crawford was an officer, agent, and attorney for the Postal Device & Lock Company, an incorporation under the laws of the State of New Jersey, engaged in the business of selling and furnishing to the Postoffice Department divers articles used in the said postal service; that during the period aforesaid and on the 6th day of May, 1902, the First Assistant Postmaster General, acting under the advice of the said Machen, advertised for bids for letter carriers' satchels to be used during the period of four years beginning on July 1st, 1902; that on the 3d day of June, 1902, before the awarding by the Postoffice Department of any contract for the furnishing of said satchels for said period, the said Machen, said Crawford, and one George E. Lorenz conspired to defraud the United States by means of the following dishonest scheme; namely, that said Crawford should procure the Postal Device & Lock Company to offer to the said Postoffice Department a bid for furnishing so many of the said satchels as might be needed by the said Department during said period of four years from the 1st day of July, 1902, and that the said Crawford should at the same time induce the said Postal Device & Lock Company, before offering said bid, to enter into a contract with the said George E. Lorenz by the

terms of which it should be agreed, in the event that the said bid of the said Postal Device & Lock Company should be accepted by the Postoffice Department, and said contract to furnish said satchels should be awarded to the said Postal Device & Lock Company, that whenever and so often as the said Postal Device & Lock Company should under such contract sell and furnish any number of such satchels and receive from the said Department payment for the same, the said Postal Device & Lock Company should allow and pay over to the said George E. Lorenz all and so much of such payment as should remain after the said Postal Device & Lock Company should pay for the cost of manufacturing and delivering of such satchels to be sold and furnished, and should have retained for itself out of such payment an additional sum equal to 25 cents for each of the satchels so sold and furnished.    The indictment then alleges that it was further agreed by and between the said Crawford, Machen, and Lorenz, as a part of said dishonest scheme for defrauding the United States, that all the moneys which, in accordance with and by virtue of the said contract between the said Postal Device & Lock Company and the said George E. Lorenz, were to be from time to time paid by said company to said Lorenz out of all payments made to said company by the said United States for such satchels, should be divided between them, the said Crawford, the said Machen, and the said Lorenz, in certain proportions and upon some certain basis and principle of division, to the grand jurors unknown, and upon a plan and by a method whereby the share of the said moneys thus to be allotted and paid to the said Machen in accordance with the said unlawful conspiracy should be transmitted to him, the said Machen, by and through the agency of said Crawford and said Lorenz; and that the said Machen should from time to time, whenever such payments should be made by the Department on account of any of the said satchels so to be sold and furnished by the said Postal Device & Lock Company, receive and accept from and through said Crawford and said Lorenz a certain share of all such payments, the proportion of such share being to the grand jurors unknown; the said Machen being, as aforesaid, an officer of the United States,

and the general superintendent of the free delivery system, and charged with and performing as such officer and as such general superintendent the several duties hereinbefore stated and set forth, and said Crawford and Lorenz well knowing that said Machen was such officer, etc. The indictment further states that thereafter, on the 25th of June, 1902, a contract was entered into by the United States with said Postal Device & Lock Company by the terms of which the United States agreed to purchase from the said company, at certain prices fixed and stated in the said contract, so many of the said satchels as might and should be needed by the said Department in the said postal service during the period of four years, to begin July 1st, 1902; and that thereafter, and in pursuance of said conspiracy, said Crawford presented in the name of said Postal Device & Lock Company a certain bill against the said United States for the sum of $15,800 for 5,000 of the said satchels sold under said contract; that thereafter, on the 13th day of October, 1902, in further pursuance of said unlawful conspiracy, Machen, as general superintendent of the free delivery system, wrote upon said bill or account the words, "Approved, A. W. Machen, General Superintendent of the Free Delivery System;" and that thereafter Crawford wrote a check of the said Postal Device & Lock Company, dated October 21st, 1902, upon Spencer Trask & Company, bankers of New York city, for the payment of the sum of $5,441.35 to the order of said George E. Lorenz, and sent the same to the latter; and that thereupon, on October 28th, 1902, Lorenz, in further pursuance of said unlawful conspiracy, transmitted the sum of $900 to the said Machen.

The evidence recited in the bill of exceptions tended to establish the following facts: That, as averred in the indictment, from April 1st, 1902, to the date of the filing of the indictment the government used many letter carriers' satchels in carrying on the business of the Postoffice Department, which were purchased through the office of the First Assistant Postmaster General, in which office was the division of free delivery, which, from May 6th, 1893, to May 27th, 1903, was managed and controlled by August W. Machen; that in that division were

prepared the specifications for such satchels, which were inserted in the advertisements for bids for furnishing the same. The evidence details the part which, under the regulations and customs of the Department, the superintendent of the free delivery division took in respect of the contract for said satchels made in pursuance of the bids and of the subsequent performance of such contract. It is then shown that, in pursuance of a bid made in response to an advertisement dated May 3d, 1902, a contract was entered into between the Postal Device & Lock Company and the United States, dated June 25th, 1902, by which said company was to furnish carriers' satchels of classes A and B, and collectors' satchels of class C, for four years, beginning July 1, 1902, and was to be paid therefor $2.19 for each satchel of class A, $3.16 for each satchel of class B, and $3.15 for each satchel of class C. That on June 3d, 1902, a contract was entered into between the Postal Device & Lock Company and George E. Lorenz whereby the latter agreed to give his best services in securing a contract for said company for the manufacture of satchels for the government; that said company, acting through the defendant Crawford and said Lorenz, should jointly determine on bids; that said company should receive a profit of 25 cents on each satchel, while all the remaining profit should go to Lorenz for his services; subsequently, and after the contract between said company and the United States had been signed, another agreement was entered into between the company and Lorenz fixing the amount to be paid the latter at 45 cents for each satchel of class A, $1.19 for each satchel of class B, and 84 cents for each satchel of class C. It was next shown that the defendant Crawford had authority, by virtue of a power of attorney from said Postal Device & Lock Company, to represent the latter before the Postoffice Department in matters pertaining to the contract of June 25th, 1902, and to receive all warrants in payment for satchels furnished thereunder. There was then shown the payment by the government to the Postal Device & Lock Company of the following sums for satchels furnished under said contract: October 18th, 1902, $15,800; December 20th, 1902, $5,481.57; Jan-

uary 25th 1903, $3,337.02; and March 17th, 1903, $2,374.74. That the Postal Device & Lock Company paid to Lorenz by check as follows: October 21st, 1902, $5,441.35; December 22d, 1902, $992.90; and January 17th, 1903, $686.46. That Lorenz sent to defendant Crawford by bank draft payable to bearer, dated October 24th, 1902, $1,435.34, which Crawford drew in cash; that on December 24th,.1902, Lorenz sent to Crawford by express $250, and that on January 22, 1903, he sent him a draft for $171.62. That Lorenz made the following payments to Machen: October 27th, 1902, $900; October 25th, 1902, $500; November 4th, 1902, $488.01; December 26th, 1902, $372.34; January 22d, 1903, $257.42. Thereupon George E. Lorenz testified that at the time he entered into the contract with the Postal Device & Lock Company he had an agreement with Machen and the defendant Crawford for a division of the compensation which he was to receive thereunder, as follows: That he, witness, should have one fourth of the profit, the defendant Crawford one fourth, and Machen one half; but that he and Machen had an agreement by which what Machen and he got—three fourths—should be divided equally between them. He further testified that he made distribution of the various sums received by him in accordance with that agreement.

Defendant Crawford, testifying in his own behalf, denied any knowledge of any agreement between Lorenz and Machen, or that Lorenz was paying to Machen any part of the money received by him under the contract with the Postal Device & Lock Company. He explained the receipt of the different sums paid by Lorenz to him, Crawford, by the statement that Lorenz employed him to represent him in Washington, and to see that he got his payments under the contract promptly, and that for these services he received the sums heretofore mentioned.

*Mr. A. S. Worthington* and *Mr. John G. Johnson* for the appellant.

*Mr. Holmes Conrad,* Special Counsel for the United States, and *Mr. Daniel W. Baker,* United States Attorney for the District of Columbia, and *Mr. Stuart McNamara,* Assistant, for the appellee.

Mr. Justice GOULD of the Supreme Court of the District of Columbia, who sat with the Court in the hearing, in the place of Mr. Justice ROBB, delivered the opinion of the Court:

The first, second, and third assignments of error assail the validity of the first count of indictment numbered 24,688, the first assignment raising the point by demurrer, and the second and third by exceptions to the granting of the government's first prayer, and to the refusal of the trial court to grant the defendant's motion to instruct the jury to acquit on this count.

The indictment was drawn under section 5440, U. S. Rev. Stat., U. S. Comp. Stat. 1901, p. 3676, which reads as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than $1,000 and not more than $10,000, and to imprisonment not more than two years."

The contention of defendant is two fold: First, that an agreement is not to be held a conspiracy under this section "simply because the agreement, if carried out, might be an injury to the government;" and, second, that if such be held to be the proper construction of this section, it is void for uncertainty, under the decision of this court in *Czarra* v. *Medical Supervisors,* 25 App. D. C. 443.

It may be taken as settled law that under this section the word "defraud" does not refer solely to property and pecuniary interests. This question has been so recently fully argued before, and so carefully considered by, the Supreme Court, this court, and other Federal courts that nothing more than a reference to the following cases is necessary: *Hyde* v. *Shine,* 199 U. S. 62, 50 L. ed. 90, 25 Sup. Ct. Rep. 760; *Palmer* v. *Colladay,* 18 App. D. C. 426; *Tyner* v. *United States,* 23 App. D. C. 362; *United States* v. *Bunting,* 82 Fed. 883; *United States* v. *Curley,* 122 Fed. 738, Affirmed by Circuit Court of Appeals in 64 C. C. A. 369, 130 Fed. 10.

These authorities fully sustain the construction of this section, which holds that any agreement the object of which is to deprive the government of the services of those who are intrusted with the discharge of duties which are essential to its proper administration is a conspiracy to defraud. "No man can serve two masters; for either he will hate the one, and love the other; or else he will hold to one and despise the other." And when an officer of a department of the government, charged with a public trust in connection with contracts made by third parties to furnish supplies to that department, and with the duty of giving the government the full measure of his unbiased judgment, enters into an agreement with such contracting third party by which he is to receive a part of the proceeds of that contract, he puts himself in such a position that it is impossible for him to perform his trust or fulfil his duty to the government; and the government is defrauded of his services.

Nor does the case of *Czarra* v. *Medical Supervisors, supra,* give support to the argument that such a construction of section 5440 makes the latter void for uncertainty. In that case this court held that the words "unprofessional or dishonorable conduct," for which the statute authorized the revocation of a physician's license, made a part of the statute void because of their uncertainty, the reason being that such words were not defined by the law, and had no common or generally accepted definition. But in section 5440, the offense, so far as this case is concerned, is a "conspiracy to defraud." The word "conspiracy" has a universally accepted definition in the law, which is definite and certain; and while the courts give more flexibility to the definition of fraud, the elements which constitute it are clearly set forth in a multitude of decided cases. Both are terms of the law. As said by this court in the *Czarra Case,* the certainty required in the definition of an offense "may be accomplished by the use of words or terms of settled meaning, or which indicate offenses well known to and defined by the common law." There can be no doubt but that this has been accomplished in the section of the statutes under consideration by the use of the terms "conspiracy" and "defraud."

The fourth assignment of error relates to the qualifications of John C. Haley, who was one of the jurors who sat in the case. The record shows that when questioned under oath as to his competency Haley said he was a druggist; that he did not know the defendant; that he had formed no opinion about the case. He further testified that his drugstore was a subpostal station, and that he was the clerk in charge; that he was technically a clerk of the city postoffice, and that he received an annual compensation, which includes all clerk hire and rental, of $300 per annum. Thereupon counsel for the defendant challenged said Haley for cause, the objection being that he was "a salaried officer of the government." The challenge was overruled.

This assignment is sought to be sustained upon two grounds: First, that the juror was disqualified under the Code; and, second, that his relation to the government was such as to disqualify him from sitting in a case where the United States was prosecuting a defendant for a conspiracy to defraud.

First. The qualifications of jurors are fixed, as far as the statute law in this jurisdiction is concerned, by section 215 of the Code [31 Stat. at L. 1223, chap. 854], which reads as follows:

"Qualifications.—No person shall be competent to act as a juror unless he be a citizen of the United States, a resident of the District of Columbia, over twenty-one and under sixty-five years of age, able to read and write and to understand the English language, and a good and lawful man, who has never been convicted of a felony or a misdemeanor involving moral turpitude."

Section 217 of the Code [31 Stat. at L. 1224, chap. 854] reads as follows:

"All executive and judicial officers, salaried officers of the government of the United States and of the District of Columbia, and those connected with the police or fire departments, counselors and attorneys at law in actual practice, ministers of the gospel and clergymen of every denomination, practising physicians and surgeons, keepers of hospitals, asylums, almshouses, or other charitable institutions created by or under the laws

relating to the District, captains and masters and other persons
employed on vessels navigating the waters of the District,—
shall be exempt from jury duty, and their names shall not be
placed on the jury lists."

Reading these sections together, it seems clear that section 215
alone determines those who are qualified to act as jurors in this
District; that those who are qualified under that section are
not disqualified by section 217, but, if they come within the
terms of the latter section, have simply the right to assert their
exemption from jury duty. The words at the end of section 217,
"and their names shall not be placed on the jury list," is merely
a direction to the jury commissioners, in order that the lists
may not be filled with the names of those who, when produced
in court, can escape service by asserting their exemptions. This
view of the statute is supported by the decision in the case of
*United States* v. *Lee,* 4 Mackey, 496, 54 Am. Rep. 293, where,
in construing a similar statute, the court said:

"The jury law exempts from service on juries parties who are
engaged in public office, whether on the part of the government
or on the part of the District of Columbia. It exempts other
classes of persons also from jury duty, but the persons exempted
are not disqualified as jurors. It is simply the privilege of the
party to become exempt from jury service on account of other
engagements. But he has the capacity,—the faculty to be a
juror. It is his own personal privilege, and he alone is the
party who shall take advantage of it. If he pleases to waive
that privilege he is still a competent juror, and he has all the
functions and powers which the law imputes to a man as neces-
sary to constitute one of the twelve triers of an accused."

See also *United States* v. *Barber,* 21 D. C. 456.

The precise question here involved was decided in accordance
with the foregoing view in the following cases: *State* v. *Day,*
79 Me. 126, 8 Atl. 544; *Munroe* v. *Brigham,* 19 Pick. 368;
*State* v. *Forshner,* 43 N. H. 90, 80 Am. Dec. 132.

Second. It does not appear that the objection to Haley as a
juror on account of any bias he might entertain by reason of his
employment was specifically presented to the learned trial

judge. On the contrary, the record states that the defendant challenged him because he was "a salaried officer of the United States," using the language of section 217; while in the case of Robert L. Williams, who was called as a juror and who stated that he was a cabinet maker whose employer did work for the government, the objection was based "on the ground that his subsistence depended practically in part upon the government;" and in the case of the juror Edgar L. Barclay, who was occasionally employed by the government to exterminate rats in its various buildings, the objection was based on the ground that "his relations with government made him an incompetent juror in the case." It is thus apparent that in the case of the juror Haley the only question the court was asked to determine was whether he was disqualified as being "a salaried officer of the government." It was not argued that he was "biased" by reason of his employment, and under the circumstances section 919 of the Code [31 Stat. at L. 1338, chap. 854] seems applicable:

"No verdict shall be set aside for any cause which might be alleged as ground for challenge of a juror before the jury are sworn, except when the objection to the juror is that he had *a bias* against the defendant such as would have disqualified him, and *such disqualification was not known to or suspected by the defendant or his counsel before the juror was sworn.*"

But if it were inferable from the record that counsel for defendant intended to include in the language "salaried officer of the government" and objection to the juror arising from his employment, in addition to his alleged disqualification under section 217, *supra,* was the nature and character of such employment such as to have, *ipso facto,* disqualified him by reason of his bias necessarily resulting therefrom? As heretofore stated, the juror swore that he was a druggist; that he had formed no opinion about the case; that his drugstore was a postal substation of the Washington city postoffice; that his compensation as clerk in charge of such substation was $300 per annum, out of which he paid clerk hire and rent; that such a substation was one of the things in connection with the drug business that can hardly be avoided; that a drugstore to keep up its prestige

must sell postage stamps, and may as well get paid for it as to do it for nothing. It should also be noted that the case on trial was one in which the defendant was charged with a conspiracy to defraud, not the Postoffice Department, or the Washington city postoffice, but the United States. Its legal status was that of the ordinary criminal case in which the United States prosecutes for violation of one of its statutes. If Haley was disqualified by reason of bias inferable from his employment, he would be incompetent for the same reason in any criminal case in which the United States prosecuted; for the record fails to disclose that his special employment would be jeopardized in any degree by his action as a juror, that he knew anything of the facts of this particular case, or that the result of the trial would have any effect upon him whatsoever.

Confining our decision to the circumstances disclosed by this record, and in view of the state of the record, it does not appear that error was committed in overruling the objection to this juror.

The assignments of error numbered from five to thirteen, both inclusive, are based upon exceptions taken to the admission of testimony offered by the government relative to the taking by defendant, from the files of the Fabrikoid Company, of a letter written by him under date of April 18, 1902, to the New York Leather & Paint Company, a carbon copy of that company's reply, and the erasure, by defendant, in the index, of the reference to the page in which the copy was to be found. It appears from the testimony of John Aspinwall, president of both companies, that the defendant visited his place of business at Newburgh, New York, in the latter part of 1903, and requested the privilege of looking over his correspondence with the Fabrikoid Company; this was granted, the witness not being present when such examination was made, and that afterwards witness discovered that the copy above referred to had been taken from the book and the erasure made in the index. No question was made by defendant as to the accuracy of this testimony; indeed, his counsel not only admitted it, but produced the two letters in question, which were read to the jury. The witness there-

upon stated that when he discovered the loss of the letter from his copy book he wrote defendant a letter, charging him with its abstraction. This letter was admitted in evidence without objection on the part of defendant. Thereupon defendant offered a letter written to the witness by his counsel in reply to the letter last mentioned, in which it is stated that defendant supposed that the witness was willing that such correspondence should be taken from the files. This last letter was ruled out, as was a subsequent reply written by witness to defendant's counsel, the court standing as ground for the ruling that defendant could offer the last two letters as part of his defense. Thereupon defendant moved to strike out the letter from Aspinwall charging defendant with taking the letter and making the erasure, which was overruled.

Subsequently, when defendant was on the stand, his counsel offered his letter to Aspinwall and the latter's reply. Objection to each was sustained. The defendant testified that Aspinwall did give him permission to take what he wanted. He was then asked why he took them and what he did with them, to which objection was made and sustained. He was allowed, however, to give his reason for making the erasure in the index.

It is difficult to understand the theory upon which the letter from Aspinwall to defendant, charging the latter with taking the letters and making the erasure in the index, was admissible. But it was admitted without objection, and the subsequent motion to strike it out was addressed to the discretion of the trial court. The reply written by defendant's counsel was plainly inadmissible, but, had its exclusion been an error, it was cured by the fact that the defendant when on the stand offered the same explanation of his action; *viz.,* that he understood that Aspinwall had consented that he might take such of the files as he desired.

A more serious question is raised by the refusal to permit defendant to testify as to his intention when he took the letters from the files. The record is silent as to the object of the government in offering the testimony of Aspinwall. In the brief of the district attorney it is stated that "the government was

VOL. XXX.—2.

proving by secondary evidence the contents of a written instrument;" but the entire discussion upon this portion of the testimony, and the rulings of the court, indicate that the real object of the introduction of the circumstances in question was to show conduct on the part of the defendant, in connection with his possession of these letters and the erasure in the index, indicative of guilt. This being the case, the intent of the defendant in obtaining possession of the letters was material, and, being material, the defendant should have been permitted to testify as to his intent or motive. 1 Wigmore, Ev. sec. 581. In only one jurisdiction has any clear sanction been given to the proposition that persons are disqualified to testify as to their own intent and motive; and the only cases cited in the appellee's brief upon this proposition, which are distinctly in point, are from that jurisdiction.

Was the refusal to permit defendant to testify as to his intent harmful to his case? To answer this question correctly, it is necessary to consider the proof offered by the government bearing upon defendant's action in this particular; what defendant was permitted to show in explanation or contradiction thereof; and what, if anything, would have been added to such explanation or contradiction if he had been permitted to answer the specific question as to the intent with which he took the letters.

The testimony offered by the government on this point went no further than showng that defendant visited the office of the Fabrikoid Company, examined its letter files with the consent of Mr. Aspinwall, its president, and, without the latter's consent, took the two letters in question and erased from the index of the letter book the page at which one of the letters was to be found. There was no testimony as to the intent with which he took the letters, or that he destroyed or suppressed them. They were, in fact, produced by his counsel at the trial. Defendant, testifying in his own behalf, admitted the taking, but denied that it was surreptitious, stating that Mr. Aspinwall put him in a room by himself with the files, and said to him: "Here are the files, and here is a room for you to go in and work by yourself, *and you can have what you want.*" Defendant had already

testified as to his purpose in examining the files, *viz.,* that he had been looking over his correspondence *in order to be able to show everything,* and that he found a great many things missing, and he wanted to look over the files of the company and take what he wanted. He was also permitted to testify as to his reason for erasing the index number in the letter book, and that he did so "with the idea of putting that," *i. e.,* the letter from the company, "back, and making the file perfect." It is therefore clear that the defendant was permitted to offer testimony fully meeting the government's contention that he had taken the letters without the consent of their custodian; further, that on the subject of his intent in taking them he was permitted to offer testimony from which the only possible inference was that he desired them in order that he might show everything with reference to his transactions with the Fabrikoid Company; and that as to one letter, at least, he was permitted to testify that he took it with the intention of putting it back. To have permitted him to testify, as he offered in addition to the foregoing, that he took them with the intention of showing them to his counsel, would have added little, if anything, to his explanation; indeed, as already stated, such testimony was not directly responsive to that offered by the government, *viz.,* that he had taken the letters surreptitiously. This latter allegation he was permitted to negative fully and explicitly. It is impossible to conclude that the refusal of the learned trial justice to permit him to testify more fully as to what he intended to do with the letters was prejudicial to his defense.

This conclusion is strengthened by an examination of the two letters in question. They contained no statements which incriminated the defendant or tended in any degree to establish the conspiracy charged in the indictment. This fact would tend to negative the existence of a sinister intent on his part in taking the letters.

The fourteenth and fifteenth assignments of error are directed to the refusal of the court to allow the defendant to offer evidence as to his conduct after he had reason to believe he was suspected of the offense charged, such evidence tending to show

a consciousness of innocence on the part of the defendant. The argument is that, inasmuch as the government had offered evidence tending to show by his conduct a consciousness of guilt on his part, it was competent for him to put before the jury the evidence rejected. No adjudicated case is cited to support this proposition, and in the paragraph cited by appellant from Professor Wigmore's chapter on the subject of conduct as evidence of guilt or innocence the statement is made that "a majority of the courts profess to refuse to allow conduct to be considered for the purpose of drawing an inference of consciousness of innocence." [Sec. 293.] The rule is so well established that such testimony is not admissible that it is unnecessary to cite authorities on the proposition.

The sixteenth and seventeenth assignments refer to the refusal of the court to admit in evidence a private account book of the defendant. The latter testified that the entries showed the moneys he drew on account of the company, and was kept for the purpose of submitting to the president of the company, Mr. Chance; that he submitted the book, as it stands, to Mr. Chance. Counsel for defendant made the offer in the following terms: "I offer it for the sole purpose of showing that Mr. Chance was advised. The witness already testified he had told him verbally. I offer the record, now, in evidence, for the purpose of showing that he was advised of it in writing." In other words, the book was offered as corroborative of the testimony of the defendant that he had informed Mr. Chance verbally of the payments. The question involved is covered by the ruling of this court in *Gurley* v. *MacLennan,* 17 App. D. C. 170, where it is said: "We know of no case, and we find no case cited, in which either books of account or other memoranda were admitted in evidence, when it appeared that there were living witnesses present cognizant of the transaction sought to be proved, and fully competent to testify in regard to it."

The eighteenth and nineteenth assignments raise the question as to the defendant's good faith in contracting to furnish shoulder-straps with the satchels. He offered in evidence a number of letters written by him, as representative of the Postal

Device & Lock Company, prior to making the contract with the government, to various firms, seeking bids from them for the manufacture of shoulder-straps. These letters were offered for the purpose of showing that defendant was trying in good faith to get bids for the manufacture of bags and shoulder-straps. They were excluded, the court saying: "If the bona fides of the contract with the government were involved, or if the question of the good faith of the defendant with respect to the quality of the material used in fulfilling the contract were involved, I should see some relevancy in these letters, but the only fraud claimed, as I recall, is that the agreement was to vest a government officer with an interest in the proceeds of a valid contract." The contention of counsel for defendant was, as stated in the record, that "defendant was trying, in good faith, to get bids for the manufacture of bags and shoulder-straps." But how could that fact have any evidentiary bearing upon the question of whether an unlawful agreement existed between Machen, Lorenz, and the defendant for a division of the proceeds of a contract made to furnish such bags and straps? There was no contention by the government that the contract between the government and the Postal Device & Lock Company was fraudulent in respect of the materials furnished, or in any other respect than the unlawful division of the profits accruing therefrom.

Defendant contends that if he was acting in good faith as to the shoulder-straps, the jury should have been instructed that the fact that they were not furnished was not evidence that he had agreed that Machen might have a part of the proceeds of the contract, as requested in defendant's prayer No. 8, which was refused, and which reads as follows:

"The jury are instructed that if they find from the evidence that when the contract of June 25th, 1902, between the United States and the Postal Device & Lock Company, in evidence, was entered into, the defendant Crawford, in good faith, expected and intended that the Postal Device & Lock Company should furnish shoulder-straps with the satchels of class A and class C, referred to in said contract; that afterwards August W. Ma-

chen, superintendent of general delivery in the Postoffice Department, in his official capacity, and of his own motion, directed that the shoulder-strap known as the "Lamb strap" should be used with satchels delivered under said contract; that it was impossible for the Postal Device & Lock Company, or said Crawford, as its general manager, to obtain said straps; that the Lamb strap was accordingly furnished by the government, with the understanding on the part of said Crawford, as the representative of said company, that at the end of each fiscal year a reasonable and proper deduction should be made from the amounts payable to said company under said contract on account of its not furnishing shoulder-straps for satchels of class A and class C, as required by the terms of said contract; and that in this regard said Crawford acted in good faith, and without an intent to inflict any pecuniary loss upon the government' or to defraud it in any way,—then the jury is instructed that as to indictment No. 24,688 they are not to consider the fact the shoulder-straps were not furnished with the satchels as evidence of the guilt of the defendant Crawford."

The vice of this prayer is that it ignores the well-settled rule of evidence in cases of conspiracy, that the overt act of each conspirator, when done in pursuance of the conspiracy, or in reference to the common object, becomes the act of all, and is original evidence against all. Thus, if defendant entered into conspiracy with Machen and Lorenz for a division of the proceeds of the contract, and in effecting or facilitating that object Machen, or Lorenz, or both, adopted the expedient of relieving the contractor of furnishing the shoulder-straps, and imposed that liability upon the government, the defendant would be bound by his or their act, although he might have intended to furnish the straps, or have their cost deducted from the contract price at the time of settlement.

Under the rule stated there was no error in admitting evidence of payments made by the government to George D. Lamb. for shoulder-straps furnished by him, which is the subject of the twentieth assignment of error.

The twenty-first assignment involves the following testimony

of the defendant: The latter was asked by his counsel to state what was the substance of the conversations with Lorenz, and whether he arrived at any result with him. Witness replied:

What we arrived at was that I thought he was a good man and had valuable information and that he could——

Mr. Baker. I object to the witness stating his thoughts.

Mr. Worthington. I respectfully submit that his thoughts are of the utmost importance. The whole question here is what he thought when he entered into this arrangement with Lorenz.

\*      \*      \*      \*      \*      \*      \*

The Court. He is entitled to give his motives, of course, with respect to any agreement he entered into; but is not that different from the statement of his thoughts with respect to an individual?

\*      \*      \*      \*      \*      \*      \*

The Witness. I am coming to the agreement. These are the motives which led me into the agreement.

Thereupon, on motion, the court struck out what the witness had stated. The record proceeds to state that the witness then testified that Lorenz at that time, among other things, said that he had been postmaster at Toledo, and had had experience in these things, and knew all about mail bags, and wanted to combine with the Postal Device & Lock Company, etc.

There is no merit in this assignment of error. The witness was permitted to give his conversations with Lorenz, the facts which induced him to enter into a combination with him, and even his motives for so doing. If what he thought of him was relevant, it was surely disclosed by his subsequent testimony.

It is urged that the court erred in refusing to allow the defendant's witness, Polk, to testify whether in a conversation between the witness and Lorenz, in Judiciary square, in 1903, Lorenz said to the witness *in substance* that it would be well for Crawford to testify at the trial that $1,465 and some cents was sent back to him (Crawford) as repayment for the straps,—as a payment on account of the straps for those 5,000 bags. The

court sustained the objection on the ground that the words "in substance" should not be used; that counsel should put the exact words in the witness's mouth.

When Lorenz was on the stand for the government he was asked on cross-examination:

Did you not, in this park, in the fall of the year 1903,— when I say "this park" I mean Judiciary square,—say to Mr. Polk, in substance, that you had found, that you had discovered that the straps for the 5,000 bags at 29½ cents would amount almost to exactly what you had sent back to Crawford of the $5,441.35, and say further to Mr. Polk, in substance, that it would be well for Crawford to testify at the trial that that $1,465 and some cents was sent back to him as repayment for the straps, as a payment on account of the straps for those 5,000 bags?

A. Now, you ask me whether I said that?

Q. Yes.

A. No, sir!

Thereupon, the witness's memory having been refreshed as to his testimony on this point at a former trial, this question was asked him:

Well, did this actually happen, then, that you testified to? Did you make this suggestion to Mr. Polk about this coincidence, and suggest that it might be used by way of defense?

A. *I don't remember whether it was to Mr. Polk or Mr. Crawford, but a suggestion as to the coincidence in the figures was mentioned by me to one or the other of them.*

It appears from the foregoing that the witness sought to be impeached admitted having made a part of the statement accredited to him; and it was upon this record that the court ruled that the contradicting witness should give the exact language used by Lorenz. While the action of the trial court in this respect might be sustained under the authority of *Sloan* v. *New York C. R. Co.* 45 N. Y. 127, where it is stated that "the prin-

ciple of this subject must be, to some extent, under the control and discretion of the court," yet it was certainly justified upon the broader ground that the question asked Lorenz was collateral, and that therefore the defendant was bound by his answer.

In the case of *Sloan* v. *Edwards,* 61 Md. 89, Chief Justice Alvey states the rule upon the subject as follows: "It is true the credit of a witness may be impeached by proof that he has made statements out of court inconsistent with his testimony given in court. But it is a general rule that a witness cannot be cross-examined as to any fact which, if admitted, would be wholly collateral and irrelevant to the matters in issue, for the purpose of contradicting him by other evidence, and in this manner to discredit his testimony. And if the witness answer such an irrelevant question without objection, evidence cannot afterwards be admitted to contradict his testimony on the collateral matter."

The rule for determining whether a fact inquired of in cross-examination is collateral is thus stated by Mr. Justice Sharswood, in the case of *Hildeburn* v. *Curran,* 65 Pa. 59; "The rule is well settled that if a witness is cross-examined to a fact purely collateral and irrelevant to the issue, and answers it without objection, he cannot be contradicted. The reason is obvious. The investigation might thus branch out into any number of immaterial issues upon the mere question of the credibility of a witness. * * * The test of whether a fact inquired of in cross-examination is collateral is this: Would the cross-examining party be entitled to prove it as part of his case, tending to establish his plea ?"

To the same effect is the case of *Welch* v. *State,* 104 Ind. 347, 3 N. E. 850, in which it is said: "Whether the matter inquired of on cross-examination, and proved by the State in impeachment of Cooper, was collateral to the main inquiry or not, is determined by this inquiry: Would the prosecuting attorney have been permitted to introduce it in evidence as part of the State's case ? If he would not, it was collateral. If it was collateral, it was not competent to contradict it."

So, in the case of *State* v. *Goodwin,* 32 W. Va. 177, 9 S. E.

85, the court said: "To impeach a witness by showing that on another occasion he made a statement contradicting one made on the trial, that statement must relate to a matter material to the case,—must concern a fact involved in the evidence. There was not, and properly could not have been, involved in the case or in the evidence given any question as to what Freed said as to the transaction after its consummation. The witness had stated nothing in chief to make it fall under the rule of *Forde* v. *Com.* 16 Gratt. 547, that a witness may be impeached as to a matter, though collateral, if the statement be made in chief; nor could the State have introduced, to support the issue on its side, as evidence independent of impeachment purposes, proof of the declaration so made by Freed; and for that reason it could not be let in to contradict a witness as to this collateral and irrelevant matter; for when a witness is cross-examined on a matter collateral to the issue his answer cannot be subsequently contradicted by the party putting the question. The test of whether a fact inquired of on cross-examination is collateral, is this: Would the cross-examining party be entitled to prove it as a part of his case, tending to establish his plea?"

There can be no doubt but that the fact sought to be brought out by the question asked Lorenz would have been inadmissible as part of the testimony on behalf of defendant.

Nor did the fact sought to be proved show bias or prejudice on the part of Lorenz towards the defendant. If it had any tendency whatever in that respect, it would tend to show a friendly disposition towards him, as it suggested an apparently plausible explanation of defendant's receipt of part of the proceeds of the contract.

The twenty-third, twenty-fourth, and twenty-fifth assignments of error involve the refusal of the trial court to allow the defendant to testify to statements made by him at a conference when Lorenz and his counsel were present.

The questions asked defendant by his counsel were as follows:

"Q. I will ask you whether, at that time, you said that Lorenz understood that the remittance which Lorenz was making back to you,—that Lorenz understood that you were to keep

them and it was a secret, but that, as a matter of fact, you intended to account to your company for them."

"Q. I will ask you whether, at that time, you said that Lorenz had come to your office in the spring of 1903, and had had a conversation with you about relinquishing the contract between him and the Postal Device & Lock Company."

"Q. I will ask you whether you said, at that time, in the hearing and presence of Lorenz and his attorney, that you did not know or have any knowledge of any payments that Lorenz was making to Machen out of the money sent to him."

That these three questions call for self-serving declarations made by the defendant is so evident as to require no discussion. The testimony sought was inadmissible under any rule of evidence, no matter how broadly construed.

It is contended that error was committed in refusing to permit the defendant to answer the following question:

"Q. Now I will ask you whether in the fall or whether at any time prior to the first trial of this case, and after the investigation began, Mr. Lorenz came to your office one night and requested you to mark this contract between him and the Postal Device & Lock Company canceled, and deliver it to him at his box at the Riggs House."

In his cross-examination Lorenz had denied that he had any such conversation. No question was asked him on his direct examination touching this matter. Being collateral, it was not error to refuse to admit testimony for the purpose of impeaching him, within the authorities heretofore cited.

The twenty-seventh assignment of error relates to the admission of testimony in rebuttal which defendant claimed was only admissible as part of the government's case in chief. The language of the Supreme Court, in the case of *Goldsby* v. *United States,* 160 U. S. 70, 40 L. ed. 343, 16 Sup. Ct. Rep. 216, fully meets this contention: "It was obviously rebuttal testimony; however, if it should have been more properly introduced in the opening, it was purely within the sound judicial discretion of the trial court to allow it; which discretion, in the absence of gross abuse, is not reviewable here."

It is urged that the court erred in refusing to permit defendant's counsel to argue to the jury concerning the failure of the government to ask its witness, Trask, if Chance had told him of the remittances made by Lorenz to the defendant. Inasmuch as the government would not have been permitted, over objection, to prove what Chance said to Trask by the latter's statement, its failure to ask the question was not a proper subject of comment to the jury.

The twenty-ninth assignment of error refers to a remark made by special counsel for the government in reply to a question asked him by defendant's counsel in the course of the latter's argument to the jury. The observation was not directed to the jury, but was provoked by the question, and was addressed to the questioner. In view of the testimony adduced by defendant in his cross-examination of Lorenz, its impropriety is not manifest. But even if it were, inasmuch as the remark was not addressed to the jury, it was not error on the part of the trial court to overrule the motion that the jury disregard it. In the course of a protracted and hotly contested trial many incidents occur between counsel which must be left to the discretion of the trial court. The jury is sworn to try the case upon the evidence, and it cannot be assumed that their verdict will be affected by remarks which opposing counsel so frequently address to one another in the heat of advocacy.

The thirtieth and thirty-first assignments allege error in the. action of the trial court in refusing to grant defendant's motion to discharge the jury because of a remark made by special counsel for the government during his closing argument to the jury. It will be remembered that the indictment, under the first count of which defendant was convicted, charges Machen, Lorenz, and the defendant with conspiring to defraud the United States. On May 23d, 1905, Machen was granted a severance, and thereupon pleaded guilty. The objectionable statement by the special counsel of the government was as follows:

"This indictment, or the one we are more concerned with here, charges that Machen and Lorenz and Crawford entered into an unlawful agreement to defraud the United States,—a

conspiracy, they call it. Machen has pleaded guilty, Lorenz has pleaded guilty—

"Mr. Worthington. One moment. Your Honor, I ask that the jury be instructed that they are not to consider that statement (that Machen had pleaded guilty).

"Mr. Conrad. It has been stated a dozen times here. The gentleman has himself stated it.

*          *          *          *          *          *          *

"Mr. Conrad. The jury will not consider it as operating on Crawford—

"The Court. I have to instruct the jury that they are not to consider that statement.

"Mr. Conrad. Do not consider it, gentlemen, in any way."

Counsel for defendant moved the court to discharge the jury from the further consideration of the case because of the statement made by counsel for the government. This motion was overruled. Thereupon the court inquired of counsel for the defendant if his instructions were full enough with reference to the objectionable statement, to which counsel responded: "I think your Honor has done all you could do in that regard."

Thereupon special counsel for the government resumed as follows: "I hope I shall not transgress when I say to you that Lorenz has appeared before you on the witness stand and confessed this business, and told you how it occurred. The third man, Mr. Crawford, has pleaded not guilty, and you are trying him. That is the situation. My reference to Machen was not that you might consider it against this man at all. You could not. But it is a fact that you all know and it has been repeated a dozen times in this case." Counsel for the defendant objected to this repetition of the statement; and the court repeated the instruction to the jury theretofore given.

Inasmuch as the fact that Machen had pleaded guilty was neither in evidence nor admissible in evidence, the statement of special counsel was improper. But the situation is clearly within the ruling of the Supreme Court in *Dunlop* v. *United States,* 165 U. S. 486, 41 L. ed. 799, 17 Sup. Ct. Rep. 375; when that court said: "The court held that it"—language used

by the district attorney in his argument to the jury—"was improper, and the district attorney immediately withdrew it. The action of the court was commendable in this particular, and we think this ruling, and the immediate withdrawal of the remark by the district attorney, condoned his error in making it, if his remark could be deemed a prejudicial error. There is no doubt that, in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused. In such cases, however, if the court interfere, and counsel promptly withdraw the remark, the error will generally be deemed to be cured. If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation."

This case has been followed in the recent case of *Sawyer* v. *United States,* 202 U. S. 150, 50 L. ed. 972, 26 Sup. Ct. Rep. 575, in which the court held that an improper remark made by the district attorney was no ground for setting aside a verdict where the trial court held it was improper and counsel withdrew it.

In the case of *State* v. *Phillips,* 117 Mo. 389, 22 S. W. 1079, the identical question involved in these assignments was passed upon, the court saying: "On argument before the jury, one of the counsel for the prosecution made the statement 'that Brown had been convicted and sent to the penitentiary for ten years.' Upon objection made to this statement the court reproved the attorney, and told the jury that they had nothing to do with the fact that Brown was in the penitentiary. In such circumstances it should not be held that reversible error has occurred,—especially so as the fact of Brown's conviction must have been well known in the community. Indeed, Brown's name was frequently, and of necessity, mentioned during the trial as one of the coindictees in the case, and mentioned also in the indictment and in the instructions."

From the decisions of the Supreme Court and of this court,

and from the weight of authority in other jurisdictions, it may be laid down as a general rule that a withdrawal of objectionable remarks made by a prosecuting officer, either by himself or by the court, or a timely direction by the court to disregard them, will be deemed to have removed any prejudice produced in the minds of the jury thereby, and to have so far cured the error that a reversal will not be had therefor. Jurors are supposed to be competent to understand, and willing to obey, the instruction of the court as to what they shall and shall not consider in reaching a verdict. *Brady* v. *United States,* 1 App. D. C. 246; *Price* v. *United States,* 14 App. D. C. 399; *Yeager* v. *United States,* 16 App. D. C. 362; *Lorenz* v. *United States,* 24 App. D. C. 337; *Fields* v. *United States,* 27 App. D. C. 433.

The case of *Capital Constr. Co.* v. *Holtzman,* 27 App. D. C. 125, cited in appellant's brief, is clearly distinguishable from the cases cited. There the judgment was reversed because of incompetent testimony admitted over objection, which testimony was used in argument to the jury by counsel who adduced it, and no instruction was given to disregard it.

The thirty-second and thirty-third assignments of error are based upon the refusal of the court to grant defendant's thirteenth and fifteenth prayers. The first instructs the jury that payments made by Lorenz to Machen were not to be considered by the jury *for any purpose whatever,* unless they were satisfied by the evidence, beyond a reasonable doubt, that before said payments were made the defendant had agreed with Machen and Lorenz, or with one of them, that said payments should be made by Lorenz out of moneys received by him. Had this prayer been granted, the jury would have been forbidden to consider the fact that defendant's associate, Lorenz, was using part of the proceeds of their contract with the government to corrupt a government official, as a circumstance from which, in connection with others, they might deduce an agreement to divide said proceeds. It was properly refused.

So with the fifteenth prayer, which seeks to limit the evidential force of the payment of 25 per cent by Lorenz to defendant to the question of defendant's connection with the conspiracy.

As an overt act, the fact of such payments was admissible against all the parties to the conspiracy.

Finding no substantial error in the record, and being satisfied therefrom that defendant had a fair and impartial trial in accordance with the settled rules of criminal law and procedure, the judgment will be *affirmed*.

Mr. Chief Justice SHEPARD dissenting:

I find myself unable to assent to the judgment in this case for the following reasons.                                    e

1. In my opinion there was error in overruling the defendant's challenge of the juror Haley. I agree that in so far as section 217 of the Code is concerned, the juror, even if he may be regarded as "a salaried officer of the United States," in a technical sense, had merely a right to claim exemption from jury duty thereunder. It was not a positive disqualification, which required him to be set aside without his claiming the exemption. I think, however, that the objection went further than this, and directly raised the question of his eligibility in the particular case as an employee of the government, receiving a stated salary, which he clearly was. The rule of the common law on this subject is thus stated by Blackstone: "Jurors may be challenged *propter affectum,* for suspicion of bias or partiality. This may be either a principal challenge, or to the favor. A principal challenge is such, where the cause assigned carries with it prima facie evident marks of suspicion either of malice or favor; as, that a juror is of kin to either party within the ninth degree; that he has been arbitrator on either side; that he has an interest in the cause; that there is an action depending between him and the party;    *    *    *    that he has formerly been a juror in the same cause; that he is the party's master, servant, counselor, steward, or attorney,    *    *    *    all these are principal causes of challenge; which, if true, cannot be overruled, for jurors must be *omni exceptione majores* [above all exception]." 3 Bl. Com. 363. See also Thompson & M. Juries, p. 176.

By an overwhelming weight of authority this rule is recognized in this country; and there is no provision of our Code changing it or impairing its vigor.

A few cases only need be cited in which it has been held that it is error to permit a clerk or employee of a private party or a corporation to sit as a juror over the objection of the opposite party: *Central R. Co.* v. *Mitchell,* 63 Ga. 173, 179; *Hubbard* v. *Rutledge,* 57 Miss. 7, 12; *Louisville, N. O. & T. R. Co.* v. *Mask,* 64 Miss. 738, 744, 2 So. 360; *Burnett* v. *Burlington & M. R. Co.* 16 Neb. 332, 334, 20 N. W. 280; *Omaha & R. Valley R. Co.* v. *Cook,* 37 Neb. 435, 445, 55 N. W. 943; *Houston & T. C. R. Co.* v. *Smith* (Tex. Civ. App.) 51 S. W. 506; *Michigan Air Line R. Co.* v. *Barnes,* 40 Mich. 383, 385. In *Louisville, N. O. & T. R. Co.* v. *Mask, supra,* the court said: "It does not matter that he had the self-confidence to swear that he could try the cause impartially. It was not for him to determine his competency on that point. When the fact was developed that he was in the employment of appellant the law adjudged him incompetent. The law does not lead jurors into the temptations of a position where they may secure advantage to themselves by doing wrong, nor permit the possibility of the wavering balance being shaken by self-interest."

These were all civil cases. For a stronger reason the doctrine applies in criminal prosecutions. The juror in this case was not only in the employment of the United States, receiving a salary for his services, but also exercising a privilege valuable to him in his business. It caused his drugstore to be frequented by the public, some of whom he could reasonably expect to become his customers. He was not even an employee protected by the rules of the civil service. It is not to be presumed that the juror would have lost his employment or privilege in the event of agreeing to a verdict unsatisfactory to those in a position to take it from him at will, or that he would necessarily have been influenced by such an apprehension. The law is not made for particular individuals, but for all persons similarly situated; and, as said by the supreme court of Mississippi, it does not permit one to be subjected to the possible temptation to do

wrong. All rules tending to preserve the integrity and impartiality of the jury should be strictly observed. The vitality and efficiency of trial by jury depend upon it.

2. I am also convinced that error for which the judgment ought to be reversed was committed in the exclusion of evidence offered to show the motive or intent of the defendant in removing certain letters from the files of the Fabrikoid Company, which act was proved by the government as a circumstance tending to show guilt. To present the question clearly, it is necessary to state all of the proceedings having relation to it.

It appears from the bill of exceptions that John Aspinwall, president of the Fabrikoid Company, of Newburgh, New York, was produced as a witness by the government. He identified two letters written by him to the defendant on February 18 and 28, 1902, respectively. He testified that defendant visited his place of business in the latter part of 1903, and requested the privilege of looking over the correspondence of the Fabrikoid Company, his letters to the company and copies of the company's letters to him in its letter book; that defendant was permitted to examine the same in the absence of the witness. After his departure, witness discovered that a letter from the defendant and a copy of a letter that had been written to him had been removed from the copy book. This copy was a carbon sheet pasted in the letter book under its proper date, and indexed therein. The letter that had been removed had been indexed, and the index entry had been erased. The letter book from which the copy had been removed was exhibited to the jury. Counsel for defendant admitted that the letter had been removed from the letter book and the erasure made, and produced the letter taken therefrom. Counsel for the government read in evidence the said letter of defendant of April 18, 1902, and the letter of April 21 by the company in reply thereto, both of which had been removed from the letter book of the company. The letter of defendant related to the prospects for obtaining the contract for bags manufactured of fabrikoid, and asked if there had been any other calls for the leather of the company for the same purpose, and, in particular, if a call had been made on the

17th, 18th, or 19th inst. from a Mr. Lorenz, and added, "If so, please turn him down and notify me." The reply thereto stated that no call had been made by Lorenz, and that the contract sent by defendant had been signed and forwarded, adding: "In this contract I made no statement relative to your commission, but simply gave the discounts which I had quoted you." The letter written by the witness to defendant December 7, 1903, called his attention to a matter that had just come to the knowledge of the writer, which he did not like. He referred to the removal from the files of the copy of the letter and the erasure of the page from the index, stating that circumstantial evidence directly pointed to defendant, adding: We gave you without question the right to look through our correspondence, and this has deeply affected us as a want of good faith on your part." The letter concluded thus: "We have not yet gone through other files to find how many other letters may have been removed, but in view of this we would not be surprised to find that some other correspondence may have disappeared." Witness then stated that he had received a reply to this lettter from the counsel for defendant. Defendant's counsel then offered in evidence this reply, which was objected to and excluded. Counsel then moved to strike out the letter of witness which had just been read. He said: "I concede that this transaction is evidence proper to go before a jury. A letter has been read from the witness to defendant, calling attention to the disappearance of these papers from his office, which letter could, as I respectfully submit, be of no possible relevancy or pertinency in this case, unless coupled with the answer that might be made to it. It contains statements made by the witness which would not be evidence for a moment. He has stated what took place; what he wrote to Mr. Crawford or anybody else, I submit, should not be evidence for any purpose; and I did not object to the letter being offered in evidence because I took it for granted that it was going to be connected with Mr. Crawford by showing what answer came to it. Now, I am very anxious, since this letter has been gone into, that the jury should have the whole thing. I was anxious that what followed in the way of correspondence between this company and

Mr. Crawford's counsel should not appear here for very obvious reasons; but when it has been gone into, I want the whole of it to go in."

The court said: "I cannot see that this letter from Mr. Crawford's counsel should be considered by the jury. The letter written to Mr. Crawford is relevant as tending to prove that he was charged by Mr. Aspinwall with abstracting the letter from the files."

Counsel: "My point is this: If the charge had been made in Mr. Crawford's presence, of course it would have been competent to show his conduct and demeanor. But the charge, I submit, would not be competent for any purpose except as connected with what he did; and so when a letter is written to a man which contains statements about something which he is said to have done, I submit that it is not competent." It was further said: "Can the charge made to him stand, and not the fact of his denial?"

The district attorney stated that the letter was offered for the sole purpose of showing that it was brought home to Crawford's knowledge that Aspinwall knew that he had taken these letters away with him; that it was not claimed that Aspinwall could make a charge in that letter that would stand against the defendant at all; but "we do claim that we have a right to argue from that letter that Crawford knew, in 1903, that Aspinwall knew that he had discovered this."

Counsel for defendant: "I can see how it might have effect to know that a charge was made against him, and that he did not deny it; and yet here a charge is to be made against a man, and his denial shut out. Now I respectfully submit that either the charge and the denial should both go in, or they should both go out."

Counsel for defendant then offered the letter of witness of December 10, 1903, replying to the letter received from counsel, which the court also excluded. This letter tended to qualify the charge made in the letter to defendant that had been read in evidence.

At a subsequent stage of the trial, and in the course of de-

fendant's testimony on his own behalf, counsel exhibited the letter to Aspinwall of December 8, 1903, written by counsel, which had been excluded, as heretofore noted. The witness said the letter was sent by his authority. This letter was again offered in evidence, and excluded. Counsel said that he was not disputing the fact that the defendant took the letter, but that he took it without leave. The court stated he could prove the fact that he took the letter with leave, but could not do so by reading the letter of his counsel. Witness was then permitted to state that he had several letters missing, and went to Aspinwall's office, and told him about the prosecution, and that he had some of his correspondence missing, and asked him if he would give permission to go over his files and get what he wanted. Aspinwall gave him a room next to his office, that was a file room. He "went over the files alone, took some memoranda of dates and contents of letters, and when he came to this particular letter, which he had forgotten about, he deemed it of such great importance"—here the witness was stopped by an objection. His counsel stated: "I want him to state not only what took place, but I want him to state his intention, and the reason for taking the letter. I want him to state whether he took this evidence with the intention to suppress it, or to destroy it, or with the intent that it might be preserved to be presented to a jury when his day of trial should come." This was objected to by counsel for the government, who said: "The purpose to which he proposes to apply these papers, and how he proposed to use them, has nothing to do with the question of the taking. He may have done a wrong thing from a good motive. He may have wanted to put these letters to legitimate use. But he has no right—I do not mean to use a harsh term—*to steal evidence which he intends to use legitimately.*" Witness then proceeded to say that Aspinwall told him: "Here are the files, and here is a room for you to go in and work by yourself, and you can have what you want." He then said: "I took the letter of April 18, and took the reply from the letter book." He was then asked why he took them. This was objected to. Counsel then asked the following question, telling the witness not to

answer until permitted by the court: "What did you do with these letters after you had taken them?" This was objected to, and objection sustained. Counsel said: "I offer to prove that he brought them to his counsel in Washington."

On re-cross-examination by the government, he was asked if he did not testify, as shown by the report of his evidence on a former trial, as follows: "I did not think that Mr. Aspinwall would want me to take a letter, mutilate his files; I did not think that he had any objection except on that ground; but I did not think he would want anyone to mutilate his file, and I took the letter out and rubbed that out, so that he would not know, and that I might have possession of the letter." The defendant stated that he so testified. An attempted explanation by the witness was excluded as argumentative. Counsel for defendant then stated that in view of the matter having been gone into, on re-cross-examination, he would ask witness the following question, stating to him not to answer until given leave: "What did you do with the letter which you took from the letter-press book of Mr. Aspinwall after you had taken it?" Objection to answer to this question was sustained.

It will be observed that counsel for defendant had not objected to Aspinwall's evidence of the spoliation of the letter book, for the reason stated, that it was conceded to be admissible as a circumstance tending to indicate a consciousness of guilt. He relied upon proving by the defendant that his motive was not an evil one, and that the act was done for the purpose of actually preserving the letters. This is made clear by the concluding recitals as follows:

"Thereupon counsel for the defendant made the following statement:

" 'Before I go on, your Honor, I want to move to strike out so much of the testimony, especially of Mr. Aspinwall, as relates to the taking from his office of the letter of April 18th, 1902, and the reply thereto dated April 21st. The ground of the motion is that the defendant's counsel understood it was offered for the purpose of showing an attempt on the part of the defendant to suppress testimony. But since the court excluded the evidence

of the defendant tending to show that he took the letters for the purpose of preserving them as testimony, and that he had no intent to destroy them, I can conceive of no part which that testimony can play in the case. I therefore move to strike it out.'

"The Court. The question, as I recall, was not objected to at the time. The witness was under cross-examination, and it was admitted for the purpose of testing the credibility of the witness.

"Mr. Worthington. Your Honor is right; it was not objected to, and I did not object to it, because I conceived and conceive now that it was competent; that the purpose of it was to show an attempt on the part of the defendant to suppress evidence. Of course it would be competent then. I offered to show by him that that was not his intent, however, and that he took the letters for the purpose of preserving them as evidence, and how they came to be preserved. But your Honor excluded all that.

"The Court. And I was about to say that had the objection been made I would have admitted it, upon the theory I had in mind at the time of making the other rulings which followed later. That was that specific acts of a defendant or anybody else who comes on the stand as a witness, if they are of a nature which in the judgment of the court tends to throw light in the minds of the jury upon the moral makeup of the individual, and thus enable them to come to a conclusion as to what his sworn word is worth, may always be had, subject only to the discretion of the court as to the point. That discretion ought to prevent any abuse of any witness, or any holding up of a witness to ridicule or disgrace, or anything of the sort; and I was then and am now of the opinion that the mere fact, if it can be proven by the cross-examination of a witness, whether he abstracted a letter from anybody else's files, is a fact that may tend to throw light upon the question in the minds of the jury; and that is why it was admitted."

In view of these recitals it is idle for the government now to urge that the sole purpose of offering Aspinwall's testimony was to prove the contents of a letter then in the possession of the

defendant, and which he was ready and willing to produce. The purpose plainly was not only to prove an attempted suppression of evidence, but to aggravate that act by showing that it was done surreptitiously; in other words, was, as charged, an attempt to "steal evidence." In reply to this evidence the defendant had not only the right to deny taking the letters without consent of Aspinwall, but the clear right to testify to his intent or motive, to remove, as far as might be possible, the effect of the incriminating act. In the language of the Supreme Court of the United States: "It has often been decided that where the intent is a material question the accused may testify in his own behalf as to what his intent was in doing the act." *Wallace v. United States,* 162 U. S. 466, 477, 40 L. ed. 1039, 1043, 16 Sup. Ct. Rep. 859.

My brethren concur in the view that the refusal of this evidence was error, but decline to reverse the judgment therefor, because, in their opinion, the exclusion of the evidence was not harmful error. I cannot agree with that conclusion. It has been said by the Supreme Court of the United States that "it is elementary that the admission of illegal evidence over objection necessitates reversal." *Waldron* v. *Waldron,* 156 U. S. 361, 380, 39 L. ed. 453, 458, 15 Sup. Ct. Rep. 383; *Throckmorton* v. *Holt,* 180 U. S. 552, 557, 45 L. ed. 663, 665, 21 Sup. Ct. Rep. 474. The doctrine applies equally to the rejection of legal evidence. The respective provinces of court and jury are clearly delimited. The credibility of witnesses and the weight of evidence are for the exclusive determination of the jury. It is said that if the defendant had been permitted to testify he would have added little, if anything, to the explanation he was permitted to make, that he did not take the letters surreptitiously. Grant that this might have been the case, or that his statement of intent might have done his case more harm than good with the jury, still it was their exclusive province to determine the weight to be given it. It is not for the court to speculate upon its probable effect upon their minds. It is to be remembered, in this connection, that the explanation referred to, which the defendant was permitted to make, related solely to the charge that

he had taken the letters without the consent or knowledge of Aspinwall. This want of knowledge by Aspinwall was but an incident of the main, incriminating fact that he had attempted to suppress evidence, and would have been utterly inadmissible as an independent, unrelated circumstance. As an incidental and related circumstance it tended to strengthen the inference that in taking the letters he intended to suppress evidence. Had it been indubitably shown that Aspinwall did consent to the removal of the letters, the effect of defendant's attempt to suppress the evidence would remain unimpaired. The fact that Aspinwall had testified to his want of consent to, and even knowledge of, the removal of the letters, rendered it more important that the defendant should testify to his intent in taking them, and have the jury determine the weight to be given to his explanation.

For the reasons given, I am of the opinion that the judgment should be reversed.

A motion by the appellant for a rehearing, made on May 15, 1907, was overruled by the court, May 16, 1907, Mr. Chief Justice SHEPARD dissenting.