**UNITED STATES of America**

v.

**James A. CONLON.**

Crim. No. 79–380.

United States District Court, District of Columbia.

Oct. 26, 1979.

G. Allen Carver, Jr., Robert S. Tignor, Public Integrity Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Plato Cacheris, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

This Memorandum is filed in further explanation of the Court's Order of October 15, 1979, granting the renewed motion to dismiss Count I of the indictment against defendant, the former Director of the Bureau of Engraving and Printing. That indictment charged him with violating 18 U.S.C. § 208(a) (1976 and Supp. I 1977) by participating as a government officer in a proposal by the American Bank Note Company ("ABN") while he was "negotiating and had an arrangement concerning prospective employment" with ABN.[1]

Section 208(a) of Title 18, U.S.C. is the part of the bribery and conflict of interest laws that prohibits a federal employee from participating in official actions that affect a person or organization in which the employee has a financial interest. Section 208(a) provides in relevant part:

> Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, [or] of any independent agency of the United States . . . participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a . . . contract . . . or other particular matter in which, to his knowledge . . . any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—

---

1. By Memorandum and Order of September 28, 1979, the Court dismissed three other counts against the defendant, which charged him with perjury before a grand jury in violation of 18 U.S.C. § 1623.

Shall be fined not more than $10,000, or imprisoned not more than two years, or both.[2]

The indictment charging the defendant Conlon with violating section 208(a) alleges in its entirety that:

In the period from in or about December 1976 through June 1977, in the District of Columbia, JAMES A. CONLON, the Defendant, being an officer and employee of the executive branch of the United States Government, that is, the Director of the United States Bureau of Engraving and Printing, unlawfully and knowingly did participate personally and substantially as such officer and employee, through decision, recommendation, and the rendering of advice, in a proposal of the American Bank Note Company for a Security Signature System for U. S. Currency, a particular matter in which to his knowledge the American Bank Note Company, a company with which he was negotiating and had an arrangement concerning prospective employment, had a financial interest.

On September 7, 1979, the defendant filed a motion to dismiss Count I, alleging that the indictment failed to state an offense and that as drafted, the indictment was so vague that it did not sufficiently apprise the defendant of the accusations against him. Simultaneously, pursuant to Rule 7(f), Fed.R.Crim.P., the defendant filed a motion for a Bill of Particulars asking, *inter alia*, that the Government:

6. State upon what date or dates the government contends that the defendant negotiated or was negotiating with ABN. State further where and with whom such negotiations took place and state the substance of these negotiations.

7. State upon what date or dates the defendant had an arrangement concerning prospective employment within ABN.

Motion for a Bill of Particulars, September 7, 1979, at 1.

The Government opposed the motion to dismiss on the ground that the indictment sufficiently charged an offense under the statute, and adequately informed the defendant of the nature of the accusations against him. *See* Government's Response in Opposition to Defendant's Motion to Dismiss the Indictment, September 19, 1979, at 1–5. The government opposed the request for particulars about the acts of negotiation because it "request[s] specification of what is clearly evidentiary material." It objected

---

**2.** Section 208 provides in full:

Acts affecting a personal financial interest

(a) Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, partner, organization in which he is serving as officer, director, trustee, partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—

Shall be fined not more than $10,000, or imprisoned not more than two years, or both.

(b) Subsection (a) hereof shall not apply (1) if the officer or employee first advises the Government official responsible for appointment to his position of the nature and circumstances of the judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter and makes full disclosure of the financial interest and receives in advance a written determination made by such official that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee, or (2) if, by general rule or regulation published in the Federal Register, the financial interest has been exempted from the requirements of clause (1) hereof as being too remote or too inconsequential to affect the integrity of Government officers' or employees' services. In the case of class A and B directors of Federal Reserve banks, the Board of Governors of the Federal Reserve System shall be the Government official responsible for appointment.

to giving particulars about the nature of the "arrangement" because to do so "would serve none of the objectives of a bill of particulars and would in effect compel disclosure of the Government's legal theory and evidence." Government's Response to Defendant's Motion for Bill of Particulars, September 19, 1979, at 2–3.

■ On September 28, 1979, after argument of the motions, the Court declined to dismiss Count I and granted, in greater part, the motion for a Bill of Particulars. In denying the motion to dismiss, the Court noted that "Defendant conceded at argument that . . . favorable action on his Motion for a Bill of Particulars would cure the defects at issue." Memorandum and Order, September 28, 1979, at 1.[3] As a result of defendant's concession, the Court did not reach his claim that the indictment failed to state an offense. By accompanying Order, the Court granted the request for particulars 6 and 7, *supra*, because "they seek to identify only the nature and time of the essential acts of alleged participation as a government officer in contract negotiation with an organization with whom the defendant was allegedly negotiating for employment." Order, September 28, 1979.

The Government responded to the Order by filing a Bill of Particulars on October 4, 1979. In response to request 6, seeking particulars of the acts of negotiation, the Government reiterated its allegation:

that the defendant was negotiating with ABN on December 7, 1976; December 22, 1976; April 21, 1976; May 10, 1977; May 17, 1977; June 21, 1977 and June 24, 1977.

But the Bill of Particulars conceded that:

*We do not know when, where or with whom such negotiations were begun.* The defendant has admitted discussing employment with Edward Weitzen on or about *June 10, 1977,* and *soon thereafter agreed to work for ABN.*

Bill of Particulars at 4 (emphasis added). In response to request 7, seeking particulars of the alleged arrangement for employment, the Government responded again:

The Government alleges that the defendant had an arrangement for employment with ABN on December 7, 1976; December 22, 1976; April 21, 1977; May 10, 1977; May 17, 1977; June 21, 1977 and June 24, 1977.

But with respect to the arrangement, the Government conceded that:

*We do not know where or with whom the arrangement was made nor do we know when it began, whether it was written or oral or whether a date for employment had been arranged.* The defendant has admitted discussing employment with Edward Weitzen on or about June 10, 1977 and soon thereafter agreed to work for ABN.

Bill of Particulars, at 4 (emphasis added).[4]

---

**3.** Ordinarily, the filing of a Bill of Particulars will not salvage a defective indictment. *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). However, the Court treated the defendant's representations that a Bill of Particulars would "cure" any defects as a conditional offer to waive any right to contest the sufficiency of the indictment pursuant to Rule 12, Fed.R.Crim.P. Accordingly, the Court, in its September 28 Memorandum and Order, dealt only with the defendant's claim that the indictment did not sufficiently protect him against later jeopardy for the same offense. *See* Memorandum and Order, September 28, 1979, at 1. *Cf. Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), *rehearing denied*, 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1975) (indictment serves both 'to apprise defendant of charge and as a bar to future jeopardy). It did

not reach the defendant's claim that the indictment failed to charge an offense under section 208, which is here renewed.

**4.** It is important to note that the dates specified in the Bill of Particulars identify dates on which the defendant participated in the ABN proposal as a government employee, and not dates on which he was negotiating or arranging. Indeed, the Government maintains that the arrangement or process of negotiating might have come into being at some unspecified time prior to December, 1976, when the defendant is first alleged to have participated substantially in the ABN proposal.

On October 10, 1979, the Government filed a motion to amend its Bill of Particulars to, *inter alia*, add an additional date to paragraphs 6 and 7 on which the defendant was allegedly negotiating or had an arrangement with ABN. ·First

On October 2, 1979, pursuant to the Court's pretrial direction, the Government filed its proposed jury instructions, which include instructions construing the terms "negotiating" and "arrangement." The proposed instructions would have directed the jury that:

The term "arrangement concerning prospective employment" means a plan or agreement with respect to future employment.[5]

The term "negotiating" means submitting and considering offers until an acceptable offer is made, and accepted, or until it becomes apparent that no acceptable offer will be made. The brevity or the length of this process does not remove it from "negotiating." [6]

The definition of "arrangement" is drawn from Webster's New World Dictionary (College Ed. 1968), and the definition of "negotiating" from *United States v. McShain, Inc., supra,* a civil contract action involving government procurement.

Meanwhile, a discovery dispute erupted that required court intervention. The Government resisted defendant's requests under Rule 16, Fed.R.Crim.P., for his chronological files and other materials useful to refreshing his recollection about his daily activities during all of 1976 and the first six months of 1977.[7] The Government contended that the chronological files and related papers were not material within the meaning of Rule 16(a)(1)(C) and that the request should be denied as "a demand for an open-ended inspection and examination of the Government's files." [8]

At oral argument on the motion, the Government acknowledged that although the indictment specified that the alleged acts of substantial participation in the ABN proposal were confined to the period from December, 1976, to June, 1977, the "arrangement" or "negotiating" might have arisen or taken place any time during the defendant's tenure as director of the Bureau.[9] Accordingly, the failure of the indictment to specify when the alleged connection with ABN arose rendered the defendant accountable for all his actions over an 18-month period. The Court granted the defendant's discovery request on the ground, among others, that the defendant needed the materials to prepare himself to recall and account for all his activities during the 18-month period in which, according to the Government, he might have initiated an "arrangement" or a process of "negotiating."

On October 9, 1979, in response to what the defendant described as the "in large part, inadequate" response by the Government to the Bill of Particulars, the defendant renewed his motion to dismiss Count I on the same grounds raised in his original motion to dismiss. *See* page 657, *supra.* The defendant noted that "[t]he existence of negotiations or an arrangement must coincide with an act of substantial participation." Memorandum of Law in Support of Motion to Dismiss, October 9, 1979, at 3. Further characterizing the Government's response to the Bill of Particulars, the defendant concluded:

---

Amended Bill of Particulars, October 10, 1979, at ¶¶ 6, 7. This date—June 15, 1977—reflects an additional occasion on which the defendant allegedly advocated ABN's proposal to the government. Like the other dates, it bears no relationship to acts of arrangement or negotiating. *See id.* at ¶ 3(g).

5. Government's Proposed Jury Instructions, October 2, 1979, at No. 10, *citing* Webster's New World Dictionary (College Ed. 1968).

6. Government's Proposed Jury Instructions, *supra* at No. 9, *citing United States v. McShain,* 103 U.S.App.D.C. 328, 330, 258 F.2d 422, 424, *cert. denied,* 358 U.S. 832, 79 S.Ct. 52, 3 L.Ed.2d 70 (1958).

7. A list of the material requested by the defendant is attached as Exhibit 1 to Government's Memorandum in Support of the Government's Motion for an Order Directing James A. Conlon to Comply with the Provisions of Rule 16(b)(1)(A), *etc.,* September 26, 1979.

8. Government's Memorandum, *supra* note 7, at 4, 6 n. 8.

9. Count Two of the indictment alleged that the defendant was negotiating or had an arrangement for employment with ABN in October, 1976.

All in all, the government appears, by its own admissions to know nothing about any arrangement or negotiations. The government's response to the bill of particulars, thus, does not cure the defect present in the indictment.

*Id.*

In the argument on the motion to dismiss, the Government proffered and the defendant conceded that a witness would testify that in November, 1976, prior to the alleged acts of participation, the defendant told the witness that he would be joining ABN when he retired from the Bureau. Further, the Government represented that witnesses would testify that while the defendant was still director of the Bureau, he participated personally in the selection, leasing, design and furnishing of offices that he subsequently occupied as an officer of the American Bank Note Development Corporation, a wholly-owned subsidiary of ABN. The Government stated that it would produce documentary evidence and testimony that the defendant, acting for ABN, met with agents of the lessors and architects and inspected the space.[10] According to the Government, this evidence, in addition to other evidence not proffered, would demonstrate that the defendant was negotiating or had an arrangement with ABN while still the director of the Bureau and while actively involved in consideration of a proposal to the Bureau by ABN.

---

**10.** The transcript of defendant's testimony before the Grand Jury also discloses that the defendant communicated with ABN personnel about the office space. *See* Testimony of James A. Conlon, April 6, 1979, at 19–23 (filed in the instant criminal action on September 7, 1979).

 The indictment does not, however, charge that the defendant's effort with respect to office space for ABN was itself an "arrangement" for employment. The Government cites this proffer merely as evidence of an arrangement not otherwise specified.

**11.** A criminal statute that "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954), or is so vague and indefinite that "it encourages arbitrary and erratic arrests and convictions,"

---

## II.

### A.

 The absence of any authoritative definition of the terms "negotiating" and "arrangement" has prompted threshold consideration of the possibility that the statute may on its face be so vague as to violate the Constitutional guarantee of due process.[11] The Government, in apparent recognition of the difficulties posed by the terms and the Court's duty to avoid Constitutional issues by a narrowing construction, has suggested a number of interpretations which in its view would solve the vagueness problem.

For example, the Government's proposed jury instructions defined "arrangement" as a "plan or agreement with respect to future employment." This definition was not chosen or extrapolated from legislative history or from Court decisions. The Government selected it from among several common dictionary definitions which differ one from the other in critical respects. Thus, Webster's Third New International Dictionary 120 (Unabridged Ed. 1968) defines "arrangement" as both "a preliminary step or measure" and as a "mutual agreement or understanding." As a result, under one common definition, an "arrangement" would require proof of some mutual agreement about employment, whereas under the second definition, proof of any preliminary step, however tentative, could constitute an

---

*Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972), is void for vagueness. *Colautti v. Franklin*, 439 U.S. 379, 388, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *see generally Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

 In construing a companion to section 208, the Court of Appeals for this Circuit noted that the statute should be considered in terms of whether it provides fair warning to the persons and in the setting to which it is directed. *See United States v. Brewster*, 165 U.S.App.D.C. 1, 506 F.2d 62 (1974).

 Conflict of interest is not the sort of offense that is governed by the more relaxed standard of vagueness for economic crimes suggested in *United States v. National Dairy Corp.*, 372 U.S. 29, 36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

arrangement. Thus, under the second definition, circumstantial evidence of an employee's unilateral plan or mere intention to seek employment with an organization doing business with him as a government official might be sufficient to establish guilt under an indictment charging participation by the employee in a matter involving a person with whom the employee had an "arrangement."

Similarly, the Government relies for its definition of "negotiating" on *United States v. McShain, supra,* 103 U.S.App.D.C. at 330, 258 F.2d at 424. "Negotiating" is interpreted as

> submitting and considering offers until an acceptable offer is made, and accepted, or until it becomes apparent that no acceptable offer will be made. The brevity or the length of this process does not remove it from "negotiating."

Government's Proposed Jury Instructions, *supra,* at No. 9. *McShain* involved a civil action on a contract. The Government offers no reason why this definition should be applied to a criminal prosecution under section 208. Moreover, the excerpt upon which the Government relies for its definition follows a description of a traditional exchange of offers—precisely the sort of exchanges the proof of which, the Government contends, is *not* necessary or required by its concept of "negotiating." Thus, in *McShain* the Court of Appeals stated (in a sentence preceding that excerpted by the Government):

> We see, in the above-described documents introduced by the Government, a textbook example of a contract. There was an invitation to the defendant to make an offer, an offer, and its acceptance.

At 330, 258 F.2d at 424.

The dictionary definitions of negotiating are no less subject to serious confusion. Negotiating is defined as either "communicat[ing] or confer[ring] with another so as to arrive at the settlement of some matter," or "carrying on business or trade." Webster's Third New International Dictionary, *supra* at 1514. The first definition would appear to require proof of communicating with the *purpose* or *goal* of reaching a settlement, whereas under the latter, proof of any discussion about the subject of employment would establish the "negotiating" element of the crime. These distinctions, which arise simply from the choice of one common definition or another, have substantially different practical consequences that in the context of section 208 might trigger criminal liability for otherwise innocent and constructive government service.

Yet the statute does not make clear nor did the indictment advise the Court or the defendant which of these definitions, if any, the Government intended to import into it; the proposed instructions are not binding and can be amended to conform to the proof. According to the proposed instruction, an arrangement entails a "plan or agreement." The Bill of Particulars, purportedly detailing the existence of an arrangement, alleged first that an arrangement existed as early as December 7, 1976. Yet, later in the same paragraph, the Particulars stated that "[t]he defendant admitted discussing employment with Edward Weitzen on or about June 10, 1977 and *soon thereafter agreed* to work for ABN." Bill of Particulars, October 4, 1979, at ¶ 7. The necessary implication of the last sentence is that the agreement—and consequently, according to one element of the proposed instruction, the "arrangement"—did not come into being until *after* June 10, 1977, although the indictment and the Particulars allege that it existed at some unstated time before December, 1976. Assuming that the Bill was intended to support, not contradict, the indictment, the only conclusion is that the Government has at least two theories of what constitutes an "arrangement," only one of which is fairly reflected in the proposed instruction. Similarly, although the Government defines "negotiating" as entailing "submitting and considering offers," they identify only a single discussion, on June 10, 1977, while maintaining that the defendant was negotiating from at least December, 1976, onwards. *See* Bill of Particulars, *supra,* at ¶ 6. If the Government cannot reconcile its understanding of "ar-

rangement" and "negotiating" with the indictment and the Bill of Particulars, it is difficult to understand how these terms can be said to give the defendant or the Court the warnings which the Constitution requires.

At oral argument on the motion to dismiss, the Government suggested other definitions of "arrangement" and "negotiating" that might avoid these inconsistencies and remove the Constitutional problem. The Government suggested that the terms describe inchoate "stages" or "states" that have abstract existence, but do not require any concrete acts such as discussions, communications, or bilateral agreements. Thus, the Government suggested that an offer by an organization to a government employee would create a state of "negotiating" unless and until the employee affirmatively rejected the offer. It would not, for example, require continuing discussion, nor would it permit the process of "negotiating" to lapse without some definite act. Such an interpretation, while it might succeed in encompassing the acts of defendant Conlon, would substitute other obvious and serious problems of vagueness for those it sought to cure.

■ Ultimately, the Government has suggested that its broad definition of the term "arrangement" should not be considered overly vague in light of the courts' acceptance of broad, imprecise definitions of the term "agreement" in the context of conspiracy law. While it is true that the object of conspiracy law is to punish agreements, see United States v. Feola, 420 U.S.

671, 694, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915), and that the term has, in that context, been held to have a sufficiently fixed meaning, see Crawford v. United States, 30 App.D.C. 1, 12 (1907), rev'd on other grounds, 212 U.S. 183, 29 S.Ct. 260, 53 L.Ed. 465 (1909), there are important differences in the two contexts that emphasize the deficiencies of the terms in section 208(a).

■ To begin with, conspiracy is an offense well known at common law, and the term agreement in a conspiracy is a term of art that has a reasonably well-defined and settled meaning known to potential defendants and to the courts. It is this historical evolution of the concept of an agreement that makes the term constitutionally acceptable. Crawford v. United States, supra.[12] Precisely this history is lacking in section 208, which was enacted by Congress less than 20 years ago to replace a statute in which the terms "arrangement" and "negotiating" did not appear.[13] No reported decision construes these terms.

■ More importantly, the punishment of agreements by conspiracy laws is saved from vagueness by several important limitations that are absent from the interpretation the Government offers for section 208(a). First, because agreement is an inchoate concept, it is well established that the Government must prove that the defendant entered into the agreement with specific intent to carry the project to completion. See 18 U.S.C. § 371; United States

---

12. Analogously, the Supreme Court has been able to give content to the terms "advocate" and "teach" because, in the context of a criminal prosecution, they were "already [been] construed as terms of art carrying a special and limited connotation." Yates v. United States, 354 U.S. 298, 319, 77 S.Ct. 1064, 1077, 1 L.Ed.2d 1356 (1957). Similarly, one of the grounds upon which the Court in United States v. National Dairy Corp., supra, relied in holding that section 3 of the Robinson Patman Act, 15 U.S.C. § 13a, was not impermissibly vague was that the terms there at issue had "meaningful referent[s] in business practice or usage." 372 U.S. at 36, 83 S.Ct. at 599. See also United States v. Reid, 175 U.S.App.D.C. 120, 126, 533

F.2d 1255, 1264 (1976) (tradition gives content to concept of fraud).

13. The history of section 208 and the provenance of the terms "arrangement" and "negotiating" are discussed infra at 665–667 and note 31. It is well established that particular care must be taken in defining new criminal offenses. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); see Scarbeck v. United States, 115 U.S.App.D.C. 135, 145, 317 F.2d 546, 556 (1962); cert. denied, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077, rehearing denied, 375 U.S. 874, 84 S.Ct. 35, 11 L.Ed.2d 105 (1963).

*v. Crimmins,* 123 F.2d 271 (2d Cir. 1940) (L. Hand, J.); *People v. Mader,* 313 Ill. 277, 145 N.E. 137 (1924) (common law); M. Bassiouni, Substantive Criminal Law 215–16 (1978). By contrast, the Government has contended here that a violation of section 208 may be established on the basis of general intent. *See* Government's Memorandum About 18 U.S.C. § 208, October 2, 1979, at 9–12 ("Specific criminal intent or a conscious purpose of wrongdoing is not an essential element of Section 208").[14]

■ Second, an indictment charging a conspiratorial agreement must be manifested by an overt act.[15] By contrast, the Government claims here that an "arrangement" triggering the sanctions of section 208 may be demonstrated without proof of any concrete acts manifesting its existence. Thus, neither the indictment nor the Bill of Particulars here allege any specific acts or statements purporting to constitute negotiating or arranging.[16]

■ Finally, the breadth of conspiracy law derives from the supposed danger of secret combinations to break the law, *see Iannelli v. United States,* 420 U.S. 770, 778–79, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *Callanan v. United States,* 364 U.S. 587, 593–94, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961); *United States v. Rabinowich, supra,* 238 U.S. at 78, 35 S.Ct. 682. By contrast, the Government does not allege a combination here, nor is the prospective employer charged with any offense. Nothing in the statute as construed by the government would require bilateral negotiations or a bilateral arrangement to create criminal liability. Ironically, according to the Government's construction, a charge for conspiracy to violate section 208(a) would require more substantial and detailed allegations and proof than would a charge under section 208 itself.

Even if legislative history could be incorporated by reference to give meaning to the terms "arrangement" and "negotiating," the elusiveness of the terms would still give pause. The terms first appeared in federal conflict of interest law in 1962. In enacting section 208, Congress added "any person or organization with whom he is negotiating or has any arrangement concerning prospective employment" to the list of outside connections prohibited to a Federal employee transacting official business with that person or organization.[17] The predecessor

14. The Government may well be correct in asserting that section 208 requires only general intent. However, the absence of a requirement of *mens rea* may be a persuasive reason either to find the statute impermissibly vague or to construe it more narrowly than if specific intent were an element of the crime. As the Supreme Court noted last Term in *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979): "This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*"

15. 18 U.S.C. § 371; *see Fiswick v. United States,* 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946); *Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942); Note, *Developments in the Law—Criminal Conspiracy,* 72 Harv.L.Rev. 920, 948 (1959).

16. The Government has characterized the June 10, 1977, meeting with an ABN official, which defendant has admitted, and which was included in the Bill of Particulars at '' 6, 7, as "surplusage" and not an overt act of arranging or negotiating.

By contrast, the overt acts alleged in an indictment for conspiracy may provide substantial detail about when, where, and under what circumstances the alleged agreement arose. Thus, in upholding an indictment for conspiracy, this Court of Appeals drew attention to particular allegations contained in the overt acts as helping to put the defendants on notice of the charges against them. *United States v. Haldeman,* 181 U.S.App.D.C. 254, 343–344, 559 F.2d 31, 120–21 (1976), *cert. denied sub nom., Ehrlichman v. United States,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250, *reh. denied,* 433 U.S. 916, 97 S.Ct. 2992, 53 L.Ed.2d 1103 (1977).

17. The addition of the terms "arrangement" and "negotiating" is discussed in the House Report accompanying H.R. 8140, 87th Cong., 1st Sess., which was subsequently enacted and codified at 18 U.S.C. § 208. *See* H.Rep.No.748, 87th Cong., 1st Sess. 13 (1961) [hereinafter House Report]; S.Rep.No.2213, 87th Cong., 2d Sess. (1962) [hereinafter Senate Report], U.S. Code Cong. & Admin.News 1962, p. 3852; note 31, *infra.*

The Memorandum of the Attorney General Regarding Conflict of Interest Provisions of Public Law 87–849, 28 Fed.Reg. 985, 988

of section 208, 18 U.S.C. § 434, had barred dealings by a federal employee only with an organization of which he is "an officer, agent or member of, or directly or indirectly interested in the pecuniary profits or contracts." Although the 1962 statute evinces a clear purpose to expand the prohibited connections with outside organizations related to employment,[18] the legislative history is completely silent as to what an arrangement or negotiation might entail.[19] Thus, the House Report accompanying H.R. 8140, of which section 208(a) was a part, stressed the need to expand section 434 to prohibit government employees from participating in a matter of interest to, *inter alia*, a "prospective employer."[20] But the section analysis of the provision fails to define or discuss when or how the connection with a prospective employer becomes impermissibly close.[21] Thus, the legislative history provides none of the definition which might possibly cure the statute's vagueness.

Section 208(b),[22] which provides an employee in jeopardy under section 208(a) an opportunity to obtain an advance determination of the permissibility of his actions, fails to save section 208(a) from vagueness.

Although the section was plainly addressed at the potential unfairness of the unusually broad reach of section 208(a),[23] the provision cannot be relied on to give content to terms otherwise without fixed meaning. Section 208(b) is addressed to the disclosure of a government official's financial interests in outside organizations, not connections with such organizations arising from present or prospective employment.[24] Section 208(b) provides that the official may make an advance "disclosure of the financial interest" and receive a written determination of whether it is "so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee." 18 U.S.C. § 208(b). Section 208(b) contains no similar provision for a determination of whether the official's contacts with a prospective employer are impermissibly close, nor is there any evidence that section 208(b) was designed to reach such questions. More fundamentally, to make fruitful use of section 208(b) an employee must first know that he is in peril under section 208(a). If its provisions are without plain meaning, the protection afforded by section 208(b) is relatively meaningless.[25]

(1963), merely paraphrases the terms of the statute, noting that it forbids an employee from participating officially in a matter of financial interest to an organization "with which he is connected or is seeking employment . . ."

For a discussion of the history and terms of the 1962 conflict of interest statute, see generally B. Manning, Federal Conflict of Interest Law (1964); Perkins, *The New Federal Conflict-of-Interest Law*, 76 Harv.L.Rev. 1113, 1130–34 (1963).

**18.** *See* House Report, *supra*, note 17, at 13; Perkins, *supra*, note 17, 76 Harv.L.Rev. at 1133. Both section 434 and section 208 prohibit financial interests and "status" connections—such as employment—with outside organizations with respect to which the federal employee is also participating in an official capacity.

There is no allegation that the defendant had any prohibited financial interest in ABN, and the Court is concerned only with the "status" connection of "arrangement" or "negotiating" for prospective employment.

**19.** *See* 666–668, *infra*. The history of the 1962 conflicts reform is summarized in Perkins, *supra*, note 17, 76 Harv.L.Rev. at 1113–17.

**20.** House Report, *supra*, note 17, at 13.

**21.** *Id.* at 14.

**22.** Section 208(b) is set out in full at note 2, *supra*.

**23.** The House Report, *supra*, note 17, notes that section 208(b) was included because "it is unfair to require the government employee to act at his peril in drawing the line between substantial and trivial interests . . . ."

**24.** *See id.* at 24:

[Section 208(b)] provides a system whereby the Government may utilize the services of its employees in situations in which under the present law a de minimis financial interest in a matter may . . . compel disqualification under criminal penalties.

**25.** Section 208(b)(2) also provides for exemption of a "financial interest" by general rule or regulation if it is "too remote or too inconsequential to affect the integrity of Government officers' or employees' services." 18 U.S.C. § 208(b)(2).

### B.

 In considering section 208, however, the Court is, as the Government implicitly suggests, guided by two general principles: first, courts should refrain from passing on the constitutionality of a statute unless it is absolutely necessary;[26] and, second, where a precise and narrow judicial interpretation may save a statute from impermissible vagueness, that interpretation should be employed.[27]

 The Court finds that such a narrowing construction is available for section 208(a) by construing "negotiating" to require allegations of specific acts of negotiating by the defendant in concert with a prospective employer; and by construing "arrangement" to require allegations of specific bilateral arrangements or acts of arranging. Such a construction, while consistent with a conclusion that the statute is constitutional, requires dismissal of the indictment here for failure to charge conduct proscribed by the statute as construed.

This interpretation of the terms of section 208(a) is consistent with the multiple purposes of the 1962 amendments to the federal conflict of interest laws. In enacting the general reform of the federal bribery, graft and conflict of interest laws, Act of October 23, 1962, Pub.L.No.87–849, 76 Stat. 1119 (codified at 18 U.S.C. §§ 201–218), the Congress expressed three distinct purposes:

> (1) to strengthen, revise, and simplify existing Federal conflict-of-interest laws, (2) to make appropriate general provision for consultants and temporary employees in the executive branch . . . and (3) to integrate these conflict-of-interest laws with recodified prohibitions of bribery and graft—all to the end that improper and unethical practices will be prevented without depriving the Government of the services of competent and conscientious men and women.[28]

Although the need to eliminate loopholes in the existing law was stressed,[29] even more attention was paid to the need for avoiding restrictions that would expose government employees unfairly to criminal punishment and, in the long run, deprive the federal government of the services of able men and women.[30]

---

Executive Order 11,222, 30 Fed.Reg. 6469 (1965), as amended by Executive Order 11,590, 36 Fed.Reg. 7831 (1971), delegates authority under Section 208(b) to the appropriate agency head. However, the Treasury Department regulations governing defendant's conduct do not construe the terms "arrangement" or "negotiating"; they simply state that a government employee may not participate substantially in a matter of financial interest to an organization of which "he is an employee or prospective employee." 31 C.F.R. § 0.735–21(e) (1978). If anything, this description is less precise than that found in section 208 itself.

The conflict of interest disclosure provisions of Executive Order 11,222 do not require disclosure of negotiations or arrangements with prospective employers, although they do require disclosure of all existing connections with outside business organizations. *See* Executive Order 11,222, at § 401(a)(1)(A).

**26.** *See, e. g., United States v. Rumely*, 345 U.S. 41, 48, 73 S.Ct. 543, 97 L.Ed. 770 (1953); *Rescue Army v. Municipal Court*, 331 U.S. 549, 568, 67 S.Ct. 1409, 91 L.Ed. 1666 (1946).

**27.** *See, e. g., United States v. Harriss*, 347 U.S. 612, 618 & n.6, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *Screws v. United States*, 325 U.S. 91, 98, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688, *rehearing denied*, 297 U.S. 728, 56 S.Ct. 588, 80 L.Ed. 1011 (1936).

**28.** House Report, *supra* note 17, at 2.

**29.** The House Report noted that the existing law "fails to proscribe participation in matters in which . . . [a] prospective employer has a financial interest." House Report, *supra* note 17, at 13. *See also id.* at 2 ("The consensus of public expressions on the subject has criticized existing Federal legislation in this area as inadequate and confused."). Significantly, however, the problems addressed by the addition of the prohibitions against an "arrangement" or "negotiating" with a prospective employer were not among those highlighted by the Committee in reviewing the principal deficiencies in the existing law. *See id.* at 4.

**30.** *See id.* at 2–7. The problem was also addressed by the President in a message to Congress on proposed revisions to the conflicts laws. The President noted that existing laws permitted, on the one hand, incompatible interests on the part of public employees, and "on the other hand, they create wholly unnecessary

The drafting of section 208(a) reflects attention to both of these policies. The principal portions of section 208, including those here at issue, had their genesis in a report of the Association of the Bar of New York, Special Committee on the Federal Conflict of Interest Laws.[31] In noting the need to expand section 434 to cover conflicts with prospective employers, the Committee noted:

> [G]overnment employees who anticipate leaving their agency someday are put under an inevitable pressure to impress favorably private concerns with which they officially deal. . . . The risk is not bribery through the device of job offers; the risk is that of sapping governmental policy, especially regulatory policy, through the nagging and persistent conflicting interests of the government official who has his eye cocked toward subsequent private employment.

Bar Report, *supra*, at 234. Although the Committee expressed its concern for the seriousness of the problem, it conceded that it was "virtually impossible to solve," and noted that

> One of the costs of a flexible and interflowing penetration of the private and public economy is that people will often have an eye ahead for the next move. We derive many benefits from the process of personnel flow in and out of

government. If we are to continue to enjoy such benefits of our system—and they are very great—we must be prepared to pay some small price.

*Id.* at 235. These dual concerns reflect a desire to balance the need to protect the Government from the conflicting interests of the employee with "his eye cocked" toward future private employment against a recognition of the importance of the free flow of talent between the private and the public sector. To this calculus must be added the Committee's concern that the vagueness of the existing laws exercised an undesirable deterrent effect on the ability of government to recruit talented and ambitious personnel. *Id.* at 163.

These countervailing concerns were reflected in Congressional consideration of the reform of section 434. Section 208 was designed to expand its predecessor in important respects, while at the same time including the section 208(b) mechanism in order to exclude insubstantial financial interests from statutory prohibition.

■ Congress plainly intended that prohibiting the participation by Government employees in decisions affecting organizations with whom they are "negotiating or [have] any arrangement concerning prospective employment" would expand the

---

obstacles to recruiting qualified people for Government service. This latter deficiency is particularly serious in the case of consultants and other temporary employees, and has been repeatedly recognized by Congress in its enactment of special exemption statutes." Message from the President of the United States, H.Doc. No.145, 87th Cong., 1st Sess. 3 (1961). The Senate Report on the Bill is similar, noting that the purposes of the Bill are first to simplify and strengthen existing laws, and, second, "in the interest of facilitating the Government's recruitment of persons with specialized knowledge and skills for service on a part-time basis, it would limit the impact of those laws on the persons so employed without depriving the Government of protection against unethical conduct on their part." Senate Report, *supra* note 17, at p. 4, U.S.Code Cong. & Admin.News 1962, at p. 3853.

**31.** Association of the Bar of New York, Conflict of Interest and the Federal Service (1960) [subsequently published in hardcover under that

title] [hereinafter Bar Report]. For the relationship of the Bar Association report and recommendations to the reform bill, see generally Perkins, *supra* note 17, at 76 Harv.L.Rev. 1114–17; House Report, *supra* note 17, at 7–8.

The proposal to expand section 434 to include government officials who have an "arrangement" or who are "negotiating" with a prospective employer first appeared in the Bar Association's Proposed Act as section 3(b)(4). *See* Bar Report, *supra*, at 279–80. The Proposed Act was introduced in the 87th Congress, 1st Session, as H.R. 3050 and S. 603. *See* Perkins, *supra* note 16, at 76 Harv.L.Rev. 1116 n. 14. The texts of the three Bills (H.R. 3411, 3050, and 7139) that formed the core of H.R. 8140 are set out in Hearings Before the Antitrust Committee of the House Committee on the Judiciary, 87th Cong., 1st Sess., ser. 3, at 4–25 (1961).

reach of the former statute.[32] At the same time, however, Congress shared the concern of the Bar Association Committee for permitting qualified persons to move between the public and private sectors.[33] Indeed, in describing the purposes of the bill subsequently enacted, the Senate Report referred to the "dual objectives [of the bill] of protecting Government integrity and facilitating the Government's recruitment and retention of needed personnel." Senate Report, *supra*, at 7, U.S.Code Cong. & Admin. News 1962 at p. 3856. To penalize by criminal prosecution indefinite and inchoate links to outside firms such as unsolicited offers of future employment or even unilateral hopes or plans could defeat this Congressional purpose.

█ The scope of the prohibition against connections with outside interests related to employment should also be read in *pari materia* with similar prohibitions in section 208 of outside financial interest. Although section 208(a) prohibits a government employee from participating substantially in a matter in which he has any "financial interest," section 208(b) makes clear that insubstantial interests are to be exempted.[34] A broad reading of "arrangement" or "negoti-

ating" would punish personal affiliations with organizations that would not be culpable if the affiliations were, instead, pecuniary. Assuming that Congress intended to treat consistently affiliations with a similar potential for influencing an employee's integrity and impartiality, the prohibitions in section 208(a) related to employment should not be interpreted to reach insubstantial contacts or connections. Yet, unless the statute is construed to require specific allegations about bilateral negotiating or arranging, the statute could be stretched to punish criminally the most insubstantial contacts.[35]

This stricter construction of section 208 also comports with a longstanding Congressional view that criminal penalties should be applied with care to the difficult area of conflicts of interest. Indeed, a recent commentator has identified a growing consensus that the problems of conflict of interest are most appropriately addressed through administrative regulation, disclosure, and post-employment limitations rather than criminal penalties.[36] For example, the proposed revision of the criminal code,[37] including earlier versions of the bill proposed by the Justice Department,[38] would, if enacted,

32. *See* note 29, *supra.*

33. *See* note 30, *supra.* The need for specificity is particularly acute in view of the prevalent concern for part-time employees or special consultants. *See, e. g.*, House Report, *supra* note 17, at 3–7; Senate Report, *supra* note 17 at 6–7. These persons, later defined by the statute as special employees, *see* 18 U.S.C. § 202, and included within section 208, clearly contemplate a return to the private sector after a short stint in government service.

34. *See* notes 23–24, *supra*; Senate Report, *supra* note 17, at p. 14, U.S.Code Cong. & Admin. News 1962 at p. 3863 ("Subsection (b) adopts a de minimis rule" for "insignificant" interests).

35. Interpreting section 208 to require concrete acts is also consistent with other provisions enacted by Congress as part of its overall reform. Thus, section 209, which prohibits federal employees from supplementing their salaries from certain private sources, replaced a former bar on any payments "in connection with" government service with the more precise prohibition against salaries paid "as compensation for" governmental acts. 18 U.S.C. § 209; House Report, *supra* note 17, at 13. Even more

specifically, the new statute made clear that certain benefits, such as pension, retirement, and group health plans, were not prohibited. *Id.* Similarly, the prohibitions on certain post-employment dealings with the Government were expressly clarified to require that the matter have been the "official responsibility" of the former employee while in Government service. *Id.* at 11. The term "official responsibility" was given precise and narrow meaning in 18 U.S.C. § 202(b).

36. *See* R. Vaughn, *Conflict-of-Interest Regulation in the Federal Executive Branch* 25–28 (1979).

37. *See id.* at 22. The most recent version of the criminal code reform is S.1437, 95th Cong., 1st Sess. (1977); *see* S.Rep.No.95–605, 95th Cong., 1st Sess., pt. 1, 385–424 (1977) (proposed revisions of bribery and conflict of interest provisions).

38. The Bill drafted by the Criminal Code Unit of the Justice Department was introduced by Senator Hruska as S.1400, 93d Cong., 1st Sess. *See* 119 Cong.Rec. 9664 (1973) (remarks of Senator Hruska).

eliminate section 208 as a criminal offense and make it subject, instead, to administrative regulation. According to a recent study, at least one important reason for the proposed decriminalization of the conflict offenses is that "definition of conflict-of-interest standards poses substantial problems in a government heavily involved in private sector regulation . . . ." [39]

By themselves, these proposed changes plainly do not affect the interpretation of section 208. However, as the study noted, the proposed decriminalization reflects a concern for the indiscriminate application of criminal penalties first expressed by Congress in passing the 1962 reforms. The study noted that:

> In any area where standards are ambiguous and need to be subtly developed in the very process of enforcing them, the criminal sanction prevents their development and growth . . . . [C]riminal proceedings do not provide a forum to test standards, apply new ones, or to modify the old. The criminal proceedings are rightly not the forum for experimentation, for conflict of values, and for the development of new standards and criteria. [40]

Or, as the 1962 Bar Association Report put it more bluntly:

> unlike the policy makers of the nineteenth century, we no longer are forced to cope with subtle problems of personal conduct bearing only a potential of harm with the same legal poleax we use against murder, arson, and treason. [41]

A construction of the statute as requiring allegations of specific acts, occasions or events showing the existence of an arrangement or an ongoing process of negotiating for employment should carry out the will of Congress as expressed in 1962 consistently with constitutional requirements.

In reaching this conclusion, the Court has considered the Government's references to the sweeping language of the Supreme Court in *United States v. Mississippi Valley Generating Company*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), to support a broad definition of terms. There, the Supreme Court construed section 434's prohibition against participation by a government employee in an action in which the outside organization with which he was connected had an "indirect financial interest." In *Mississippi Valley*, there was no question about the government employee's connection with the outside organization. He was an officer. 364 U.S. at 523, 81 S.Ct. 294. The issue was the nature of the financial interest of the organization in the outcome of the government decision. The Court held that the probability that Company B's being chosen to arrange the financing for a project if Company A received a government contract constituted an indirect interest in the contracts of Company A. *See* 364 U.S. at 555–57, 81 S.Ct. 294.

The Government points to the Supreme Court's statement in *Mississippi Valley* that section 434's "obvious purpose . . . is to insure honesty in the Government's business dealings," 364 U.S. at 548, 81 S.Ct. at 308, as supporting a broad definition of the terms "arrangement" and "negotiating." But it is clear that either a broad or a narrow reading of these terms would help insure honesty; the abstract statement says nothing about how far that purpose is to be carried. Moreover, in passing the present section 208 nearly two years later, Congress plainly expressed a second, and in some respects conflicting, purpose of eliminating uncertainty and protecting both employees and the Government from the effects of overly broad restrictions. [42] In this respect,

---

39. *See* R. Vaughn, *supra* note 36, at 26.

40. *Id.*

41. *Quoted* at *id.* at 27. The later published version of the Bar Report eschewed the use of "the broad axe of criminal prohibition." Bar Report, *supra*, at 149.

42. *See* note 30, *supra*. It is this second, countervailing concern that distinguishes the prohibitions against conflicts of interest, self-dealing, and postemployment contracts from those directed at bribery and graft. For this reason, the willingness of the Court of Appeals in *United States v. Brewster, supra*, 165 U.S.App.D.C. at 16, 506 F.2d at 77, to construe broadly sec-

it is significant that in passing section 208, Congress conspicuously failed to use the elastic term "indirect financial interest" that the Supreme Court had construed broadly in *Mississippi Valley.* A prominent observer of the legislation, who participated in drafting the bill that contains the essential provisions of section 208, speculated that the effect of the new law "might well preclude" the result reached in *Mississippi Valley.*[43] Far from supporting the Government's position, the decision in *Mississippi Valley,* viewed in the context of the drafting of section 208, supports the conclusion that the statute's terms should be read narrowly to require clear and concrete acts before criminal penalties are imposed.

### C.

 It remains to determine the sufficiency of the indictment in light of the foregoing consideration of section 208. It is clear that to be sufficient, an indictment must set out the material elements of the offense, *United States v. McBride,* 162 U.S. App.D.C. 141, 498 F.2d 683 (1974), and the factual allegations supporting them, Rule 7(c), Fed.R.Crim.P.; *Hamling v. United States, supra,* 418 U.S. at 117–18, 94 S.Ct. 2887. Where the statute omits an essential element of the offense, *United States v. Carll,* 105 U.S. (15 Otto) 611, 26 L.Ed. 1135 (1881), or the statute contains general or generic terms, *Russell v. United States,* 369 U.S. 749, 769, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Nance,* 174 U.S. App.D.C. 472, 533 F.2d 699 (1976), it is not enough for the indictment to allege that element merely by tracking the language of the statute. This requirement of specificity serves the purpose, *inter alia,* of "inform[ing] the Court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *Russell v. United States, supra,* 369 U.S. at 768, 82 S.Ct. at 1049, *quoting United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1875).

 This requirement is particularly relevant where the interpretation of the statute under which a defendant is charged poses difficulties and uncertainties. 369 U.S. at 769, 82 S.Ct. 1038. Thus, the mere fact that the indictment in the instant case alleged the existence of an "arrangement" and that the defendant was "negotiating" is not sufficient. Without an allegation of specific events showing the existence of a bilateral agreement or ongoing events of negotiating, the indictment fails to state an offense under section 208(a).

 This result is similar to that reached by our Court of Appeals in *United States v. Nance, supra,* which held that an indictment for false pretenses failed to state an offense where it identified the dates and the untruthfulness of the allegedly false representations, but did not allege any of the factual particulars of the false representations. 174 U.S.App.D.C. at 475, 533 F.2d at 702. The Court of Appeals there noted that "[o]rdinarily, it is proper for an indictment to be drawn in the language of the statute, but following the generic wording of a statute is not necessarily sufficient." At 474, 533 F.2d at 701; *see also United States v. Thomas,* 144 U.S.App. D.C. 44, 444 F.2d 919 (1971). The failure to specify the representations, the Court stated, would allow the "United States Attorney . . . a free hand to insert a vital part of the indictment without reference to the grand jury," *id.,* and violate "basic principles of fundamental fairness" that require a defendant to be apprised of the charges against him. *Id.*

This proposition is not affected by *United States v. McBride, supra,* relied upon by the Government in support of its claim that the indictment is sufficient. In *McBride* the Court of Appeals held that the failure of an indictment for escape to charge that the defendant's confinement was because of an arrest "on a charge of felony, or conviction of any offense" did not render it defective. 162 U.S.App.D.C. at 143, 498 F.2d at 685. In reaching this determination, the Court of Appeals found that the nature of the custo-

tion 201(g), governing gratuities, is not relevant here.

**43.** Perkins, *supra* note 17, 76 Harv.L.Rev. at 1134.

dy from which the defendant escaped was "not an 'element' of appellant's offense in the sense that it is an integral part of his *mens rea* or *actus reus*. Rather, it is a circumstance in which he committed his offense." At 144, 498 F.2d at 686. The nature of the custody from which the defendant escaped was important only in determining whether he would be charged with a misdemeanor or a felony and did not constitute an act by the defendant. In the present situation, by contrast, neither the participation by the employee in the government action nor his connection with the outside organization is itself culpable. Rather, it is the congruence of the two acts that gives rise to criminal liability. In short, they are both essential, material elements of the offense; each must be alleged and proved independently in order to convict the defendant of any offense. Nothing in the statute, its history, or plain logic supports a conclusion that one element is material while the other is only tangential and circumstantial.[44]

The same principles operate here. While it may be that evidence proffered by the government would enable a jury to infer that the defendant committed acts that would constitute "negotiating" or an "arrangement," the failure of the indictment to specify them deprives the defendant of an opportunity to defend against a specific charge about particular occurrences, and leaves the Court and the defendant unaware of whether any particular acts were considered by the Grand Jury in bringing its indictment. The prejudice to the defendant is particularly compelling here, where the defendant may be called upon to account for acts that took place at some unspecified time over an 18-month period. Although the Bill of Particulars specifies a discussion on June 10 that might constitute "negotiating" or an "arrangement," its inclusion in a Bill of Particulars cannot cure its absence from the indictment. *Russell v. United States, supra,* 369 U.S. at 770–71, 82

S.Ct. 1038; *United States v. Nance, supra,* 174 U.S.App.D.C. at 474, 533 F.2d at 701.

The Court therefore concludes that Count I must be dismissed for failure to charge an offense under section 208(a). It may be that some of the evidence in the Government's possession, such as evidence of the June 10, 1977, conversations about employment between the defendant and ABN, when combined with allegations about the defendant's substantial participation in the ABN proposal under consideration by the Government, may form the basis for allegations sufficient for a proper indictment, or the Government may obtain additional evidence from and about ABN. If so, the evidence could be submitted to a Grand Jury for the purpose of returning an indictment that shows on its face the existence of a concrete arrangement or specific acts of negotiating. As the Court stressed in its Order of October 15, 1979, the dismissal of the charge under section 208 is without prejudice to subsequent re-indictment in a form properly charging an offense under 18 U.S.C. § 208(a), as here construed.

### MEMORANDUM

A statement in the Memorandum of October 20, 1979, regarding proposed revisions in 18 U.S.C. § 208, may be incomplete. Relying upon a recent monograph about federal conflict-of-interest regulation, *see* R. Vaughn, Conflict-of-Interest Regulation in the Federal Executive Branch (1979), the Memorandum stated at page 667 that:

> the proposed revision of the criminal code, including earlier versions of the bill proposed by the Justice Department, would, if enacted, eliminate section 208 as a criminal offense and make it subject, instead, to administrative regulation.

(footnotes omitted).

Both the Justice Department's proposed revision of the criminal code, S. 1400, 93d Cong., 1st Sess., at 173 (1973), and the most recent version of the proposed reform, S. 1437, 95th Cong., 1st Sess., at 375 (1977),

---

44. It is difficult to discover any reason, except perhaps the availability (or unavailability) of proof, for the Government's willingness to specify in the indictment and the Bill of Particulars the time, circumstances, and substance of the alleged acts of substantial participation by the defendant in the ABN proposal, while at the same time maintaining that similar detail about the alleged "arrangement" or "negotiating" need be neither alleged nor proved.

would remove section 208 from Title 18, the criminal code, and transfer it to Title 5, which governs administrative procedure. Punishment for violations of the altered provision, which would be codified at 5 U.S.C. § 9107, would not be eliminated, however. It would be reduced from a felony to a Class A misdemeanor, punishable by not more than one year in jail and a fine of $10,000.

Both the transfer to Title 5 and the reduction in penalties for violation of the provision from a felony to a misdemeanor are fully consistent with the conclusion of the commentator, quoted at page 668 of the October 20 Memorandum, that the change is a "decriminalization" reflecting growing disenchantment with the use of criminal penalties for conflicts-of-interest. *See,* R. Vaughn, *supra,* at 25–28.

In any event, appreciation that the proposed administrative regulation would authorize a maximum punishment of imprisonment for one year and a fine of $10,000 would not have altered the conclusion announced in the Memorandum.